COMMISSIONERS OF SEDGWICK COUNTY v. H. W. BUNKER, *County Clerk.*

1. COUNTY INDEBTEDNESS—*Existing at Time of Division; Constitutional Law.* Chapter 142 of the Laws of 1873, relating to "taxation on the change of boundary lines," applies to cases where county bonds were legally issued and delivered by a county previously to such county being divided, or having a portion of its territory detached; and so far as it so applies, it is constitutional and valid.

2. RETROSPECTIVE LEGISLATION—*How far Valid.* There is no constitutional provision in this state against retrospective legislation, where such legislation is designed and intended to afford civil remedies or relief in cases where there is an existing moral obligation to do or

perform the act or duty prescribed thereby; and to this extent such legislation is valid.

3. DIVISION OF COUNTIES; *Apportionment of Indebtedness and Property.* Where a county is divided, the rule for the division and apportionment of the debts and property between such county and the detached territory, belongs exclusively to the legislature, and not to the courts; and when the legislature has determined how the debts and property shall be divided and apportioned, the courts cannot interfere.

## *Original Proceedings in Mandamus.*

PETITION for a mandamus filed in this court in December 1875 by the *Board of County Comm'rs of Sedgwick Co.*, as plaintiff, to compel *Bunker*, as county clerk of Harvey county, to enter upon the tax-roll of his county, and against the taxable real estate therein which was detached from Sedgwick county and included within the new county of Harvey created by § 5 of ch. 97, Laws of 1872, (p. 184,) certain taxes certified to him. An alternative writ was issued. *Bunker* answered, and among other reasons for not inserting said taxes, he submitted that, at the time said territory was detached from Sedgwick and included in Harvey county there was no law requiring Harvey county nor any part thereof to pay any portion of the bonded indebtedness of said Sedgwick county; and second, that ch. 142 of the laws of 1873, under which the plaintiff levied the taxes in question, "does not provide for a uniform and equal rate of assessment and taxation," in this, that it "provides for the assessment and taxation of real property only, exempting from taxation the personal property situated upon the territory detached from said Sedgwick county and attached to Harvey county, and that by reason thereof said ch. 142 of the laws of 1873 is null and void." The case was heard upon an agreed statement of facts, which sufficiently appear in the opinion.

*W. E. Stanley*, for plaintiff.

*C. S. Bowman*, and *H. W. Cook*, for defendant.

The opinion of the court was delivered by

VALENTINE, J.: On the 29th of February 1872, the county of Harvey was created, and in establishing the boundaries thereof a certain strip of territory was detached from the county of Sedgwick, and incorporated into the county of Harvey. (Laws of 1872, p. 184, § 5.) At the same time, and by the same act, the legislature specifically expressed their intention that said detached territory should not be relieved from any obligation which it was then under to pay its proper

1. County indebtedness — division of counties. Statutes construed. Ch. 142, Laws of 1872, held valid.

proportion of the railroad bonded indebtedness previously incurred by said Sedgwick county; (§ 6 of said act.) And only three days prior to that time the same legislature, by a general law, expressed its intention that no detached territory should, by reason of any change in county boundaries, be released from the payment of its just and equitable proportion of any indebtedness previously incurred by the county to which it had formerly belonged. (Laws of 1872, p. 180, § 9.) But the legislature failed to make its will and intention as expressed in these acts effective, as applied to this particular case. The provisions by which the legislature attempted, in the act creating Harvey county, to make its said will and intention effective, were not covered by the title to the act, and were therefore unconstitutional and void. (*Sedgwick County v. Bailey*, 13 Kas. 600.) And the general law above mentioned (Laws of 1872, p. 177, et seq.,) applies only where county lines are changed by the county commissioners and a vote of the people, and not where new counties are created and county lines changed by a special act of the legislature. Said strip of territory was therefore left by the legislature under a supposed moral obligation to pay its proportionate share of the said bonded indebtedness of Sedgwick county, but without any legal means of enforcing such moral obligation. Now in all cases, as we understand the law, where the legislature divides a county without making any legal provision for a

division or apportionment of the debts or property thereof, the old county pays all the debts, and takes all the property. (*Larmie Co. v. Albany Co.*, recently decided by the supreme court of the United States, 13 Albany Law Journal, 229.) But we do not understand that the legislature is in all cases and under all circumstances bound to make the provision for such division or apportionment of the debts and property in the same act by which they divide the county. They may certainly provide for such division or apportionment by a general law passed previously to the act dividing the county. And in some cases and under some circumstances we think that they may, by either a general or special act, make provision for such a division or apportionment even after the act dividing the county has itself been passed. Why should they not have such power, where the very act dividing the county expressly contemplates such a thing? Probably in such a case the county would not be divided except for such contemplated division and apportionment. It would seem that when the legislature divides a county, and attempts in the same act to make an equitable apportionment of the debts, but fails to do so merely because of a failure (as in this case) to make the title of the act comprehensive enough to include the provision making such apportionment, then the legislature should have the power by a subsequent act to provide for such apportionment. Perhaps the legislature would have the power to do so indirectly, by reannexing the detached strip to the old county, and then detaching it again. But they ought to have the power to do the same directly, for doing it indirectly and in such a manner would look like trifling. But subsequently to the passage of the act dividing Sedgwick county, and on March 3d 1873, the legislature passed the following act, to-wit:

"SEC. 1. All bonds heretofore or hereafter legally authorized and issued by a vote of its electors in any county or township, shall become and be a lien upon all the real estate in such county or township for the payment of the principal and interest of said bonds.

"SEC. 2. No person or property hereafter attached by a

change of boundary lines to any county or township, wherein any bonds previously authorized by a vote of the electors of such county or township shall have been previous to such change of boundary lines legally issued, shall be subject to taxation for the payment of the principal or interest of such bonds.

"SEC. 3. All real estate heretofore or hereafter detached by a change of boundary lines from any county or township, wherein any bonds shall have been previous to such change of boundary lines legally authorized and issued by a vote of the electors of such county or township, shall be subject to taxation for the payment of such bonds and the interest thereon, in the same manner as though no such change of boundary lines had been made.

"SEC. 4. It shall be the duty of the county clerk of every county from which any real estate shall be detached, as soon as it shall be determined, to certify to the county clerk of any county to which any such real estate shall have been attached, the per centum of tax to be levied for the payment of any bonds, or interest thereon, issued, as in the last section described; and such tax shall be levied and collected by such last-mentioned county from the real estate so attached thereto, the same as other taxes, and when collected, shall be paid over to the county treasurer of the county to which such taxes belong."—(Laws of 1873, p. 267, ch. 142.)

Prior to the passage of the act of 1872 detaching said territory, Sedgwick county had subscribed to the capital stock of the Wichita & Southwestern Railroad Company to the amount of $200,000, and had received from the railroad company that amount of stock; and had, in consideration therefor, legally issued to the railroad company $50,000 of the bonds of the county, and had also "signed, executed and placed in escrow" $150,000 more of the bonds of said county "to be delivered to the [said] railroad company whenever they complied with the terms and conditions prescribed in the [said] subscription." At the time of the passage of said act of 1872 said terms and conditions had not yet been fully complied with, and said $150,000 of bonds had not yet been delivered. But afterward said terms and conditions were fully complied with, and on June 1st 1872 said bonds were duly delivered to said railroad company.

The question now to be considered is, what force and effect has said act of 1873, with reference to the liability of said strip of territory to pay a proportion of the indebtedness created by the issue of said $50,000 of bonds, and said $150,000 of bonds. That is, to what extent does said act apply to this case? and if to any extent, is it constitutional and valid? That that act covers and applies to the indebtedness created by the issue of $50,000 of bonds, we think is clear beyond all doubt. But it is not so clear that the act covers and applies to the rest of said indebtedness. That the $50,000 of bonds were legally issued and delivered to said railroad company prior to any change of boundary lines, we think the evidence sufficiently shows. But it can hardly be said that the $150,000 of bonds were issued prior to that time; and if not, then the act of 1873 does not apply to them. (See § 3 of said act of 1873.) At the time said boundary lines were changed, said $150,000 of bonds were held in escrow, having no force or effect as bonds. And whether such bonds would ever have any force or effect as bonds depended upon a contingency which might or might not happen, and whether it would happen or not, no one could foretell. At the time when said boundary lines were changed no one could tell whether any indebtedness would ever accrue on said $150,000 against said Sedgwick county, or not. And therefore, as to these bonds, we hardly think the act of 1873 applies. Even if we should assume that a moral obligation rests upon said detached territory to assist in paying said bonds, still we do not think that it would assist the plaintiff in this case, for the courts cannot enforce merely moral obligations where no legal obligation exists. And if there was any such moral obligation the legislature should have known it, and should by unmistakable language have made the act of 1873 broad enough to provide for enforcing it. That is, they should have converted the moral obligation into a legal obligation. But as they did not do so, although they had the subject under consideration, it would seem that they did not intend that such moral obligation should

be enforced. We therefore think that the act of 1873 applies only to the $50,000 of bonds, and to that extent we think the act is constitutional and valid. There is no constitutional provision in this state against retrospective legislation. And

2. Retrospective legislation. therefore, the legislature may in many cases pass retrospective laws to enforce previously existing moral obligations. And we think we have already shown that this is one of such cases, unless some special provision of the constitution can be found interdicting this particular kind of legislation. The only special provision of the constitution supposed to interdict this kind of legislation, to which we have been referred, is that portion of § 1 of article 11 which provides that "The legislature shall provide for a uniform and equal rate of assessment and taxation." We are inclined to think this provision of the constitution cannot in the nature of things be made to apply to the same extent to exceptional cases like this, as it does to the ordinary cases of assessment and taxation. Wherever and whenever in the nature of things this provision can be made to apply, we think it ought to be made to apply, and it ought to be made to apply to the fullest extent possible. But where in the nature of things it cannot be made to apply, legislation with regard to taxation should not be declared void merely becaue it does not apply to the fullest extent. When a debt is created against a county, all the taxable property therein, real and personal, becomes liable to pay the same. The real estate becomes permanently liable, (except for subsequent legislation,) because the owner thereof cannot remove it out of the county; but the personal property does not become so liable, for personal property may be removed out of the county at any time at the pleasure of the owner. If the legislature should change the boundary lines of any county, and in doing so should set off a strip of the territory thereof to some other county, then the legislature might at the same time enact that such strip should continue to be liable for the payment of its share of the debts of the county to which it formerly belonged, or the legislature might entirely relieve such strip

from all such liability.    And it would seem that the legisla-

*3. Apportionment of debts and property, in cases of county division.* ture ought to have the power to relieve such strip from a portion of such liability, and to continue its responsibility for the other portion.    At least, it would seem that the legislature should have the power to say that the real estate shall continue liable, and the personal property not.    It would hardly seem that the detached terri- tory should complain because of such an arrangement, for the taxpayers of the strip would have no more taxes to pay on their real estate in proportion to its value than the taxpayers of the county from which the strip was taken would have to pay on their real estate, and they would have nothing to pay on their personal property.    They would have the advantage of the taxpayers of the county in not having any personal- property tax to pay.    Not taxing the personal property of the strip, however, makes the tax on all the other property, both of the county from which the strip is taken, and the strip itself, higher than it otherwise would be.    But as such a thing would not make the tax void as to the taxpayers of the county, could it make it void as to the taxpayers of the strip?    But suppose the personal property of the strip should also be taxed: then must the personal property brought onto the strip after its separation from the county be also taxed? It was not liable for any debt of the county before the separa- tion.    Perhaps if the strip had remained attached to the county it never would have been brought onto the strip, and therefore never would have been liable for any tax or debt of the county. Perhaps the detaching of the strip had a controlling influence in bringing such property onto the strip.    Then should such property be taxed to pay such debt?    The debt may not be due for thirty years after the detaching; and should property brought onto the strip twenty or thirty years after its separa- tion from the county, be taxed to pay an old debt of the county? These are probably questions for the legislature, and not for the courts.    But even if any portion of the personal property situated on said strip should not be taxed to pay said debt, then the uniformity of taxation contended for by the defend-

33—16 KAS.

ant would be destroyed. Where a strip of territory is detached from one county, and attached to another, and is made liable for a portion of the debts of the county from which it is detached, such detached territory becomes a taxing district of itself for the purpose of raising revenue to pay its proportionate share of said debts; and the tax levied for such purpose in such taxing district should be made as near equal and uniform as in the nature of things and under the circumstances of the particular case it could well be done. A wanton violation of the rule of uniformity in taxation, would probably even in such a case render the taxes void. Where a county is divided, the rule for the division and apportionment of the debts and property between such county and detached territory belongs exclusively to the legislature, and not to the courts; and when the legislature has determined how the debts and property shall be divided and apportioned, the courts cannot interfere.

A peremptory writ of mandamus will issue in this case to the defendant, commanding him to place upon the tax-roll of his county the amount of taxes which should have been charged against the real estate of said detached territory for the years 1874 and 1875. The questions with regard to the taxes for the years 1872 and 1873 have been determined in other cases; *Sedgwick County v. Bailey,* 11 Kas. 631, and 13 Kas. 600; and we shall not reconsider such questions in this case.

BREWER, J.: I concur in the judgment, but am not prepared to assent to all the propositions discussed in the opinion.

KINGMAN, C. J., not having heard the argument, takes no part in the decision.