RUFUS S. CRAFT, *et al.*, v. WILLIAM LOFINCK, *as Treasurer of Marshall County, et al.*

1. RETROSPECTIVE LEGISLATION; *Legal Liability; Preëxisting Moral Obligation.* It is necessary, in order to enable the legislature by retrospective legislation to impose a legal liability upon the people owning property in a portion of a township or other subdivision of the territory of the state, where no such legal liability existed before, that a preëxisting moral obligation should rest upon such people to discharge such liability.

2. ———— *Province of Legislature and of Courts.* And in such a case, it is clearly within the province of the legislature in the first instance to determine the question whether such a moral obligation exists, or not, yet it is not exclusively within its province. The determination of the question devolves at first upon the legislature, but lastly and finally upon the courts.

3. BRIDGE BONDS; *Township, Divided; Moral Obligation.* Where the people of a township, in the year 1870, voted to issue bonds to build a bridge at a certain place in the township, and before anything further was done a portion of the territory of the township was detached therefrom and placed in a new township, and the people of the new township then voted to issue bonds to build a bridge in their own township, and each township issued its bonds, payable in ten years, and both bridges were built, one in the old township and one in the new township, and the one in the new township was "an imperative public necessity," and it does not appear that the people in one township needed the bridge built in the other township; and after the bonds issued by the old township became due and payable they were refunded by such old township by the issuing of new bonds; and afterward and in 1883 the legislature passed an act, (chapter 147,) the general language of which would make the people owning real estate in the detached territory liable to assist in paying the bonds of the old township: *Held,* That such people, under the facts and circumstances of this case, are not under any moral obligation to assist in paying such bonds, and the act of the legislature of 1883, so far as it tends to make them liable, is unconstitutional and void.

*Error from Marshall District Court.*

ACTION by *Rufus S. Craft* and others, against *William Lofinck,* as treasurer of Marshall county, and others, to perpetually enjoin the collection of certain taxes. At the August Term, 1884, a judgment for costs was rendered against the

plaintiffs.    They bring the case here.    The material facts are stated in the opinion.

*W. W. Guthrie*, and *John V. Coon*, for plaintiffs in error.

*Rossington, Smith & Dallas*, for defendants in error.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought in the district court of Marshall county, by Rufus S. Craft, in behalf of himself and others, against William Lofinck, treasurer of said county, and others, to perpetually enjoin the collection of certain taxes.    A temporary injunction was at first allowed, but was afterward dissolved, and judgment was rendered in favor of the defendants and against the plaintiff for costs. The plaintiff now brings the case to this court.

The questions involved in the case arise upon the following facts and statutes: On February 24, 1870, a special act of the legislature (Laws of 1870, ch. 23) was passed, authorizing Blue Rapids township, in said county, to issue the bonds of the township to the amount of $20,000, to build a bridge across the Big Blue river at the town of Irving: provided the qualified electors of such township should first vote to issue such bonds.    About the same time, a colony of persons from the east settled in said township, about five miles above Irving, on said Big Blue river, and established the town (now city) of Blue Rapids.    On April 5, 1870, an election was held in Blue Rapids township, in pursuance of said act of the legislature; the returns thereof were duly canvassed, and it was declared by the canvassing board that the election had resulted in favor of the issuing of the bonds by a majority of three, although probably the election resulted the other way by a majority of five.    No contest, however, was ever had concerning such election.    On August 24, 1870, a certain portion of the territory of Blue Rapids township, including the town of Blue Rapids, was detached from such township; and the detached territory, together with a portion of Waterville township, was created and organized into the new township of Blue Rapids

City. After this time, but prior to the commencement of this action, the plaintiff, with others, purchased real estate in the detached territory, upon which real estate the taxes now in controversy were levied. On October 1, 1870, the contract for building the bridge at Irving, in Blue Rapids township, was made. On November 15, 1870, the aforesaid bonds of Blue Rapids township were issued, payable January 1, 1881, with interest coupons attached, payable annually on the first day of January of each year. On December 3, 1870, an election was held in Blue Rapids City township, under the general statutes of Kansas, for the purpose of authorizing the township to issue $10,000 of its bonds to build a bridge across the Big Blue river at the town of Blue Rapids. This bridge it appears was "an imperative public necessity." On December 7, 1870, the contract for the building of this bridge was made. On January 30, 1871, the aforesaid bonds of Blue Rapids City township were issued, payable in ten years. Both bridges were built—one wholly in Blue Rapids township and at the town of Irving, and the other wholly in Blue Rapids City township and at the town of Blue Rapids, and about five miles apart.

On March 3, 1873, an act of the legislature was passed, (Laws of 1873, ch. 142,) providing for the regulation of taxation on the change of boundary lines of counties and townships; but this act did not affect the rights of either of the aforesaid townships, nor of the people residing or owning property therein. In 1873 taxes were levied by Blue Rapids township for the payment of the interest on the bonds issued by such township, which taxes were extended over the detached territory. On April 27, 1874, Darius Minnium, for himself and others, commenced an action in the district court of Marshall county to perpetually enjoin the aforesaid taxes so far as they applied to the property situated in said detached territory; and in March, 1875, judgment was rendered, as asked for, perpetually enjoining the collection of said taxes. On April 17, 1876, the Citizens' Savings and Loan Association, of Cleveland, Ohio, commenced an action in the United States

circuit court against Blue Rapids township, to recover interest then due on the bridge bonds of Blue Rapids township; and on November 29, 1876, judgment was rendered in favor of such association and against Blue Rapids township for the amount of such interest. On May 2, 1879, the same association commenced another action in the same court against Blue Rapids township for interest then due on the same bonds, and on June 3, 1879, judgment was rendered in favor of the plaintiff and against the defendant for such interest. On February 14, 1881, an election was held in Blue Rapids township, under the act of March 8, 1879, (Laws of 1879, ch. 50,) to authorize the re-funding of the Blue Rapids township bridge bonds. The election resulted in favor of re-funding. This election was held only in Blue Rapids township, and the voters of said detached territory had no legal notice thereof, nor did they participate therein. On March 1, 1881, the aforesaid re-funding bonds were issued to the amount of $30,500, and the old bonds were canceled. No taxes had been levied to pay the old bonds since the year 1874, and no payment had been made on such bonds, either of principal or interest, during that time. On April 29, 1881, Blue Rapids township paid the aforesaid judgments rendered against it in the United States circuit court, out of the proceeds of said re-funding bonds.

On March 7, 1883, the legislature passed an act, (Laws of 1883, ch. 147,) to regulate the liability of townships for the payment of bonds, taxes, etc., on the change of boundary lines, which act, it is claimed, makes the real estate of said detached territory liable to be taxed for the payment of said Blue Rapids township re-funding bonds; and whether it does, or not, is the principal question involved in this case. Afterward, and in 1883, a tax was levied by Blue Rapids township for the payment of said re-funding bonds. This tax was extended over the detached territory, and levied upon the real estate thereof; and this tax is the one which is now in controversy. This is the first tax that was levied upon the detached territory for the payment of any of the Blue Rapids township bonds or inter-

est thereon, since the judgment rendered in the case of Darius ·Minnium *v.* Blue Rapids township, in March, 1875. On December 18, 1883, this present action was commenced to perpetually enjoin the collection of said tax; and the only question now involved in the case is, whether said tax is legal and valid, or not; and this question depends solely for its solution upon the further question whether § 2, ch. 147, of the Laws of 1883, so far as it applies to this case, is constitutional, or not. That section reads as follows:

"SEC. 2. That where any portion of a township has been, or may hereafter be, detached and organized into another township, or attached to another township since the vote upon which bonds were issued, such parts detached and organized into a new township or townships, or attached to another township, shall be subject to taxation for the payment of the principal and interest of such bonds, in the same manner as though no change of boundary lines had been made."

Several cases have been decided by this court, involving the interpretation and validity of chapter 142 of the Laws of 1873, but not one of such cases is applicable to this case, though some of the principles enunciated therein may have some application to this case. (*Comm'rs of Sedgwick Co. v. Bunker,* 16 Kas. 498; *Comm'rs of Ottawa Co. v. Nelson,* 19 id. 234; *Chandler v. Reynolds,* 19 id. 249; *Comm'rs of Marion Co. v. Comm'rs of Harvey Co.,* 26 id. 181.) The act of 1873 was retrospective in its operation, as well as the act of 1883, but its retroactive effect was not as far-reaching as that of the act of 1883. The act of 1873 made detached territory from counties or townships liable only for bonds that had been both "authorized and issued" prior to the detachment of the territory; (*Comm'rs of Sedgwick Co. v. Bunker,* 16 Kas. 498, 503; *Chandler v. Reynolds;* 19 id. 249;) while § 2 of the act of 1883 makes the detached territory liable where only a vote authorizing the township to issue its bonds was had prior to the detachment. The act of 1873 was held valid upon the theory that it simply furnished a remedy for the enforcement of a preëxisting moral obligation. (*Comm'rs of Sedgwick Co. v. Bunker,* 16 Kas. 498.)

24—34 KAS.

In all the cases heretofore cited where the detached territory was held liable for the payment of the debt, the debt had become complete, the evidences of the debt had been issued, and the property of the detached territory, as well as the property in the remainder of the county or township, had become legally liable for the payment of such debt prior to the detaching of such territory; and while the detaching of such territory under the laws as they then existed relieved such territory for the time being from the legal obligation of assisting the county or township from which it was detached in paying such debt, yet it was held that it did not relieve it from the moral obligation to assist in paying such debt; and when the act of 1873 was passed it was held that it simply furnished a remedy for the enforcement of such preëxisting moral obligation; or, in other words, that it so extended the preëxisting moral obligation as to make it also a legal obligation. This moral obligation was both to the old county or township which remained legally liable to pay the debt and to the holders of the written evidences of the debt. The argument of counsel in the case of *Chandler v. Reynolds,* 19 Kas. 249, which this court seemingly approved, would seem to extend the doctrine of liability in such cases a little further than above stated, but in fact it does not. In that case the debt or liability had been created prior to the division of the territory, although the evidences of such debt or liability had not yet been issued; but because the debt or liability had already been created when the division of the territory occurred, the court assumed that a moral obligation rested upon the detached territory to assist the old township in paying the debt or liability; yet the court held in that case that as the evidences of such debt or liability had not been issued at the time of the detachment of the territory, no legal obligation had been created by the act of 1873, and therefore that the detached territory was not legally bound to assist in paying such debt or liability.

In the present case, when the territory in question was detached from Blue Rapids township, nothing had been done tending to create a liability except merely the holding of an election

to determine the question whether authority should be given to the township to issue bridge bonds, or not. Such a vote does not create any liability or any contract, but merely gives authority to afterward create such liability or contract. ( *U. P. Rly. Co., S. B.*, *v. Comm'rs of Davis Co.*, 6 Kas. 256.) When the territory in the present case was detached from Blue Rapids township no liability had yet been created; no indebtedness had yet been incurred; no bridge had yet been built; no contract for building the same or for furnishing any material or labor therefor had yet been made; no bonds had yet been issued, nor had any other evidences of indebtedness yet been issued; and when the bridge was built, it was not built within the limits of the detached territory, but was built wholly within the territory of Blue Rapids township; and therefore at no time have any of the people residing upon or owning property within the limits of said detached territory been part owners of the bridge at Irving, and at no time prior to the act of 1883 were they liable to pay any portion of the indebtedness created for the construction of such bridge. They were not liable before their territory was detached from Blue Rapids township, nor at that time. They were not liable prior to the passage of the act of 1873, nor were they liable under that act; and it would almost seem as though this act was a legislative determination that they never should be liable. They were not liable when the old bonds were re-funded by the issuing of the new bonds; and they took no part at any time in any proceeding or transaction, except the first vote, to make them liable. They did not participate in issuing either the old bonds or the new bonds, nor did they take part in the election to authorize the issue of the new bonds; nor could they at the time have legally taken part in the issue of either said old bonds or the new bonds, or in the election. Besides, they built their own bridge, and paid for it; and the new bonds were issued after the old bonds had become due, and when the old bonds with all the interest thereon should have been paid. It does not appear that the bridge at Irving was of any benefit to the people of the detached territory, but on the contrary the court below

finds that as early as the year 1870 the bridge at Blue Rapids in said detached territory had become "an imperative public necessity;" and such bridge was built about that time.

From the foregoing facts the following questions arise: (1.) Is it necessary, in order to enable the legislature by retrospective legislation to impose a legal liability upon the people owning property in a portion of a township or other subdivision of the territory of the state, where no such legal liability existed before, that a preëxisting moral obligation should rest upon the people owning property in such territory to discharge such liability? (2.) And if such is necessary, then is it for the courts, or the legislature, or both, to determine whether such a moral obligation exists, or not; and in any case, whose determination is final?

Of course if the legislature has the power to impose a legal liability upon any portion of the territory of the state, without any preëxisting moral obligation to discharge such liability, then the tax in the present case is valid; or if the legislature has no such power, but nevertheless has the power solely and exclusively to determine whether such moral obligation exists, or not, then also is the tax in the present case valid. But if it is necessary, in order to enable the legislature to enact such legislation, that a preëxisting moral obligation should exist, and if the courts may determine whether such moral obligation exists, or not, and if in the present case it should be found that no such moral obligation exists, nor existed at the time when the act of 1883 was passed, then it must be held that the tax in the present case is illegal and void. This moral obligation may be considered with reference to the old organization, the county or township from which the territory has been detached, or with reference to the persons holding the bonds or other evidences of indebtedness of such old organization. Of course where bonds or other evidences of indebtedness are issued by a county or township, all the property of such county or township is morally as well as legally bound for the payment of such bonds or other evidences of indebtedness; and

1. Retrospective legislation; legal liability; pre-existing moral obligation.

the holders of the same would have a right to object to any territory being detached from the old organization in such a manner as to release the same from the legal obligation to pay such bonds or other evidences of indebtedness, or to lessen or impair the value of their securities in any respect whatever. In such a case the detached territory should not be released But that case is not this case. When the bonds were issued in the present case, the detached territory formed no part of Blue Rapids township. Such territory had been detached from Blue Rapids township nearly three months before the first bonds were issued, and over ten years before the second, or re-funding bonds were issued. When the bondholders purchased the bonds, they could not have had any expectation that the people of the detached territory would ever be under any obligation to them, legal or moral, to assist in paying the bonds, and certainly no such moral obligation has ever existed.

But it may be asked, are they not under a moral obligation to Blue Rapids township to assist in paying such bonds? We would think not. The necessity for a bridge at Blue Rapids and in Blue Rapids City township was certainly as great as the necessity for a bridge at Irving and in Blue Rapids township. Indeed, from the findings of the court below, it would seem that such necessity was greater, for the court below found that it was "an imperative public necessity to have a bridge across the Blue river near said new town to accommodate the public." The new town mentioned by the court was the town, now city, of Blue Rapids. It does not appear that either of the towns or townships needed the bridge built in the other town or township. Each township needed its own bridge, each township built its own bridge, and each township should have paid for its own bridge; and we suppose that Blue Rapids City township paid for its bridge a long time ago. The two bridges were built about the same time. No liability existed against the detached territory at the time it was detached from Blue Rapids township; nothing was afterward done by the detached territory or Blue Rapids City township to make the detached territory liable; and nothing was afterward done

by the legislature to make it liable for the payment of any liability on account of the bridge at Irving until the passage of the act of 1883, over twelve years after the territory was detached and after the organization of Blue Rapids City township, although the legislature in 1873 had the same matter under consideration ; and, taking the entire facts of the case, as heretofore stated, we would think that the people of the detached territory are not under any moral obligation to any person, corporation, or organization, to assist in paying the bridge bonds of Blue Rapids township.

But the question still remains to be decided : May not the legislature impose a legal obligation or liability upon the people of the detached territory to assist in paying said bonds, although they may not be under any moral obligation to do so? This question must be answered in the negative; and it certainly requires no argument and no citation of authorities to support such a decision. But still the further questions remain to be decided : First, is it not exclusively within the province of the legislature to determine whether the detached territory is or is not under a moral obligation to assist in paying said bonds? Second, has not the legislature in the present case determined in the affirmative? These questions are perhaps the most difficult of any in the case; and yet we think they must be answered in the negative. While it is clearly within the province of the legislature in the first instance to determine the question whether the detached territory is or is not under any moral obligation to assist in paying the bonds, yet we do not think that the question is exclusively within its province. The determination of the question devolves, first, upon the legislature, but lastly and finally upon the courts. If the detached territory is under no moral obligation to assist in paying the bonds, we think the courts may say so; and in fact we think it is the duty of the courts to say so whenever the question is fairly presented. The question is in its nature judicial, although in the first instance it may also be legislative; and the courts must determine it whenever it is fairly presented to

2. Province of legislature and of courts.

them.   If the detached territory, however, is under some obligation of an equitable or moral nature, then we would think that it would be exclusively within the province of the legislature to determine whether such obligation would be sufficient to authorize the legislature to provide a remedy for enforcing it.   But in the present case we do not think that any obligation of an equitable or moral character exists.   We do not think that any obligation of an equitable or moral character rests upon the detached territory to assist in paying the bonds issued to pay for the bridge at Irving; and we do not think that the legislature has in fact so determined.   Of course the language used by the legislature in the act is broad enough to cover such a case as this, but the language is general in its terms, covering all conceivable cases, and not applying specially to any particular case.   The legislature probably did not have this particular case in contemplation at any time.   We do not however hold the law to be unconstitutional for this reason; for if the legislature had the power to require the detached territory to assist in paying the bonds in question, we would then hold that the legislature has exercised such power and that the detached territory is liable, although the legislature may have exercised such power thoughtlessly and inadvertently as to this particular case.

3. Bridge bonds, no moral obligation on detached territory to pay.

Of course § 2 of the act of 1883, chapter 147, is not void. It is valid as to all bonds authorized by an election held after the act took effect.   It is also valid as to all bonds authorized before the act took effect and issued before the territory was detached.   It is also valid as to all bonds authorized before the act took effect where any moral obligation exists in favor of either the bondholders or the old organization, requiring the detached territory to assist in paying the bonds. (See cases heretofore cited, and Wade on Retroactive Laws, §§ 24, 242, and cases there cited.)   And it is void only where the election was held before the passage of the act and no further steps were taken to make the detached territory liable until after its

detachment, and where no moral obligation exists requiring the detached territory to assist in paying the bonds.   Such an act comes under the general objections to retrospective legislation, where no good is accomplished by the legislation, but only harm is done; where vested rights are disturbed; where the money or property of one person or set of persons is taken and given to another; and where, as in this case, the ordinary rules of taxation, the rules prescribed by the constitution and general statutes, are overturned and subverted.   The legislature cannot, by the mere forms of legislation, create a legal demand where no demand, legal, moral or equitable, existed before.   Such is not legislation.   It is not the passing of laws. It is not the legitimate action of any tribunal; and it is utterly beyond the power of the legislature. (Sedgwick on Stat. and Const. Law, 2d ed. 160, *et seq.*, and cases there cited; Cooley on Const. Lim., side-pages 369, 370, *et seq.*, and cases there cited.)

It must also be remembered that this is not an attempt to enforce a public or municipal corporation, or any corporation, or any organization of persons, to assist in paying the aforesaid bonds, but it is an attempt to enforce the *various individual persons* who own real estate in a certain locality constituting only *a part* of a municipal organization, to assist in paying such bonds.

We think that § 2 of the act of 1883, chapter 147, is unconstitutional and void, so far as it applies to this case.

The judgment of the court below will be reversed, and the cause remanded with the order that judgment be rendered in favor of plaintiffs below and against defendants below, as prayed for in the plaintiffs' petition.

HORTON, C. J., concurring.

JOHNSTON, J.: I am of opinion that by the voting of the bonds prior to the division of the township a moral obligation arose, and rested upon the people of the territory subsequently detached, to pay their proportionate share of the obligation

they had voted to assume, sufficient to sustain the retrospective feature of the statute.   I am therefore unable to concur in the conclusion reached by the majority of the court, that the statute in question is invalid.