# Longstreth *v.* City of Philadelphia.

*Municipalities—Contracts—Extra work—Appropriation—Moral obligation—Taxpayer's suit—Equity—Injunction.*

1. A city has no power to appropriate by ordinance sums of money claimed by a contractor to be due him for extra work, where there is no moral obligation to make such payment, and an ordi-

nance attempting to make such appropriation will be restrained by a court of equity at the suit of taxpayers.

2. There is no moral obligation resting upon a city to pay a contractor anything additional for alleged extra work done by him in the performance of his contract, where it appears from findings of fact, sustained by evidence, that the contractor was fully paid under the terms of his contract for everything which he did.

3. A contractor made an agreement with the City of Philadelphia for the construction of a sewer. The prices fixed by the contract were for items of work completed and in place, with no additional allowance to the contractor for labor, dredging, pumping, or any work incidental to the building of the sewer. At the request of the contractor, the city assented to a change in the method of building a portion of the sewer. By the original contract, a section of the sewer was to be built under water, by lowering blocks of concrete upon pile heads. The contractor preferred to build a bulkhead between the two piers, pump out the water and build the sewer above water, or "in the dry." This was accordingly done, and the contractor was paid the prices fixed in the contract for all material used in the construction of the sewer. The contractor brought suit against the city for the amount it cost him to build the bulkhead between the piers, for flumes and other incidental work necessary to build the sewer "in the dry," and was nonsuited on the ground that the prices fixed in the original contract included all labor, machinery, materials, etc., necessary to the completion of the work, and that the contractor was not entitled to recover for work and material not entering into the construction of the sewer, but expended in incidental work in order to build the sewer "in the dry." No appeal was taken from this decision, but thereafter councils passed an ordinance authorizing the appointment of a referee to determine whether anything was morally due the contractor, and upon the referee's report that the amount of the claim was morally due, councils by ordinance made an appropriation for its payment. A taxpayer's bill was filed to restrain the payment on the ground that the city was under no moral obligation to make it, and that the ordinance was invalid. *Held,* the court did not err in granting the relief prayed for.

Argued March 25, 1914. Appeal, No. 354, Jan. T., 1913, by Executors of the Estate of Michael O'Rourke, Deceased, from decree of C. P. No. 5, Philadelphia Co., March T., 1911, No. 2318, granting an injunction in case of William M. Longstreth, Theodore J. Lewis, Arthur H. Lea, Cyrus D. Foss, Jr., S. Weir Mitchell, Charles C.

Binney and Logan M. Bullitt v. City of Philadelphia, John M. Walton, Controller of the City of Philadelphia, and Joseph M. Smith, Arthur J. Donnelly and Michael J. O'Rourke, Executors of the Estate of Michael O'Rourke, Deceased.    Before BROWN, MESTREZAT, POTTER, ELKIN and MOSCHZISKER, JJ.    Affirmed.

Bill in equity for an injunction.

RALSTON, J., filed the following opinion:

On March 29, 1909, the councils of the City of Philadelphia passed a resolution which recited as follows:

"Whereas, Michael O'Rourke, under contract with the City of Philadelphia, constructed the Aramingo Main Sewer, between Richmond street and the Bulkhead line, on a basis of unit prices, and during the construction of the portion east of Richmond street certain changes were authorized in the plans for said work entailing additional cost, not represented by unit prices, of forty-six thousand seven hundred and twenty (46,720) dollars, the said amount being the net cost between building in water as contemplated, and pumping out water, building of flumes, coffer dams and rental of wharves, etc.; the City saved by said change of plan on unit prices the sum of thirty-eight thousand three hundred and thirty-one (38,331) dollars and sixty (60) cents, for all of which additional cost no compensation was allowed him, although the total claim did not exceed the limit of the contract."

After other recitals it was resolved that the mayor be authorized to appoint an arbitrator to investigate and adjust the claim of Michael O'Rourke and to transmit the decision of the arbitrator to councils.

In accordance with this resolution the mayor appointed J. J. deKinder, Esq., as arbitrator, who, on July 26, 1910, filed his opinion finding in favor of O'Rourke in the sum of $30,722.22, with interest from November 10, 1902.

On March 16, 1911, councils passed an ordinance ap-

propriating to the department of public works $46,-
083.30, and authorized and directed the director of that
department to draw, and the city controller to counter-
sign, a warrant for that amount in favor of the estate of
Michael O'Rourke.

The present bill was filed by taxpayers of the city, and
prays that the controller be enjoined from countersign-
ing, and the City of Philadelphia from paying, any war-
rants drawn to the order of the estate of Michael
O'Rourke in payment of the sums appropriated by this
ordinance of councils.

If the city was under any legal or moral obligation to
pay this claim, the ordinance is valid. If there is no
obligation, legal or moral, upon the city, then the ordi-
nance is an attempt to make a gift of the city's money,
and is void, as being beyond the power of councils. It is
contended on the part of the plaintiffs that the city was
under no legal or moral obligation to pay the claim,
while, on the other hand, the executors of Michael
O'Rourke contend that the city was under a moral ob-
ligation to make the payment.

In order to determine this question it is necessary to
know exactly what is meant by the term "moral obliga-
tion."

In Hawkes v. Saunders, Cowp., 289, Lord MANSFIELD
said: "Where a man is under a moral obligation which
no court of law or equity can enforce, and promises, the
honesty and rectitude of the thing is a consideration."

This doctrine prevailed in the English law for some
years. It was attacked in a note to the case of Wennall
v. Adney, 3 Bos. & Pull. 248, and the conclusion reached
by the writers of the note was declared to be correct in
Eastwood v. Kenyon, 11 Ad. & El. 438.

It was never held that every moral obligation was a
consideration for a promise, but, on the contrary, the
principle was limited to a few instances which might
better have been put upon the ground of waiver or
ratification; as, for instance, a promise to pay a debt

incurred during infancy or coverture or one that has been barred by the Statute of Limitations or bankruptcy.

(See Langdell, Summary of the Law of Contracts, Sec. 71; Leake on Contracts, 615; Pollock on Contracts, 169; also Hare on Contracts.)

The principle was considered in Kennedy v. Ware, 1 Pa. 445 (1845), in which the doctrine as stated by Lord Mansfield was repudiated. GIBSON, C. J., said:

"It is shown by a masterly review of all the cases in a note to Wennall v. Adney, 3 Bos. & Pul. 248, that Lord MANSFIELD'S principle was intended for cases in which the promissor who has received an actual benefit is protected from liability for it by some statute or stubborn rule of law. All the cases put forth by him for the sake of illustration are certainly of that stamp. 'Indeed, Lord MANSFIELD, appears,' adds the annotator, 'to have used the term moral obligation not as expressive of any vague or undefined claim arising from nearness of relationship, but of those imperative duties which would be enforceable at law were it not for some positive rule which with a view to general benefit exempts the party in that particular instance from legal liability.'"

(See also Accommodation Loan & S. F. Association v. Stonemetz, 29 Pa. 534.)

This language is repeated by Chief Justice MITCHELL in Bailey v. Philadelphia, 167 Pa. 569, at page 573. In that case a teacher was elected supervising principal by a sectional school board. After she had entered upon the performance of her duties, the Board of Education refused to confirm her election and regraded the school so as to dispense with the office of supervising principal. She held herself ready at all times to perform her duties as principal, and brought suit to compel the Board of Education to certify her name on the roll of teachers, but the suit was decided against her. Councils subsequently appropriated money to pay her salary, and the ordinance was held to be valid. Chief Justice MITCHELL

held that the law does not prohibit the city from recognizing a moral obligation as defined above; that is to say, that "there is nothing in the law or in sound public policy to prohibit the city from being honest and paying its bona fide debts which are good in conscience and justice, though for sufficient other reasons there is a general rule which prevents them from being enforceable by law."

The term "moral obligation" being understood as meaning "a duty which would be enforceable at law were it not for some positive rule which exempts the party in that particular instance from legal liability," it remains to determine whether there was any such obligation upon the part of the city in the present case.

The history of the case briefly is as follows: On August 25, 1899, Michael O'Rourke entered into a written contract with the city for the construction of a sewer in the Aramingo canal. The prices fixed by the contract were for items of work completed and in place, with no additional allowance to the contractor for labor, dredging, pumping or any work incidental to the building of the sewer. At the request of the contractor, the city assented to a change in the method of building a part of the sewer. By the original contract a section of the sewer was to be built under water by lowering blocks of concrete upon pile heads. The contractor preferred to build a bulkhead between two piers, pump out the water and build the sewer above water or "in the dry." This was accordingly done, and the contractor was paid the prices fixed in the contract for all material used in the construction of the sewer. The total amount to be expended under the contract was not to exceed $200,-000. The total amount paid to the contractor for the work done under the contract, according to the prices fixed in the contract, amounted to $161,096.30. The contractor thereupon brought suit against the city and claimed to recover the amount it cost him to build the bulkhead between the piers, flumes, and so forth, which

were necessary in order to build the sewer "in the dry," namely $46,720. As this amount added to what he had already received would exceed the sum of $200,000, the extreme price limited in the contract, the claim was reduced to $38,903.70; that is, the difference between the amount paid him, $161,096.30, and the price limited in the contract, $200,000.

This case was tried before a judge without a jury and decided in favor of the city, on the ground that the prices fixed in the original contract included all labor, machinery, material, and so forth, necessary to the completion of the work and that the contractor was not entitled to recover for work and material not entering into the construction of the sewer but expended in incidental work in order to build the sewer "in the dry." No appeal was taken from this decision.

The facts as outlined above and the decision of the court thereon are more fully set out in the Findings of Fact and Conclusions of Law and the Opinion of the Court in the case.

The suit having been decided adversely to the plaintiff, the ordinances of councils hereinbefore mentioned were passed, and the plaintiff presented a claim before the referee. This claim was not the same as that upon which the suit was brought, namely, for the extra expense of building the bulkhead, flumes, and so forth, in order to construct the sewer "in the dry," but the contractor claimed that if the work had been done under water, or "in the wet," as originally contemplated by the city engineers, he would have received, according to the prices fixed by the contract, $191,818.50, whereas, by the method adopted by him less labor and material were required, so that, although he was paid according to the terms of the contract for all the work done, he received only $161,096.30, or $30,722.20 less than he would have received had the original plans been followed. A statement showing the difference between the work actually done and what would have been necessary under the

original plans will be found at page 190, et seq., of the referee's report. The contractor therefore contends that if the sewer had been constructed under the original plan it would have cost the city $38,331.60 more than it did cost.

There can be no doubt as to the character of the claim, because it is fully set out in the testimony taken before the referee, and the referee awards to the contractor $30,722.20, which is the difference between what the contractor said the work would have cost if the original plans had been followed ($191,818.50), and what it cost actually, ($161,096.30). The claim of the contractor is therefore for money to which he claims he would have been entitled if he had done the work and furnished the materials as originally planned. It is impossible to determine how much the contractor would have received had the work been done as originally contemplated, because the calculation is based entirely upon the estimate of the engineers, which was merely an approximate calculation. However, whether or not the contractor would have been entitled to more money if he had done the additional work, the fact remains that he did not do the work. His claim is for work which was not done but which might have been done if the change of plan had not been made. He does not claim, nor has any attempt been made to show, that he has not been paid according to the contract for all the work that he did, and his contention may be thus stated: he might have got more money if he had done more work; he did not do the work, hence the money was saved to the city, therefore he should receive the amount saved; in other words, the city should pay him for work he did not do, in order that he should receive as much as he had expected to get.

The learned referee finds that "the expense to the contractor in following out his own ideas, to which the city acquiesced, was far in excess of what it would have cost

him had he gone ahead and simply adhered to the modus operandi specified in the agreement of August 25, 1899."

There is no evidence to warrant this finding. It is true that in the case tried before the court the cost of erecting the cofferdam, flumes, and so forth, was stated, but, on the other hand, the expense to which the contractor would have been put had he followed the original plan is not given. Chief Engineer Webster enumerated some of the expenses incidental to the building of the sewer under water, such as floating pile drivers, platforms, extra heavy derricks to lower blocks of concrete weighing seventy tons, the building of tramways, &c. Until the cost of these appliances is determined, it is impossible to say whether or not the method pursued by the contractor was more or less expensive than that contemplated in the original plans.

The learned referee also says: "Where the fixed charge has once been debited against a given unit quantity, and this quantity is afterwards largely reduced, every unit of the reduced quantity must be taxed with an additional amount to make up the difference." This would seem to mean that where a contractor bids on an estimated amount of work, and the work turns out to be less than estimated, the contractor is likely to lose money, or at least not to make as much as he had expected.

In the estimate of the quantities of work attached to the specifications of the contract, it is expressly stated that the estimates are approximate only, and the contractor must satisfy himself and verify their accuracy, and will not be allowed to set up any claims against the city based on the inaccuracy of the estimates or the amount of the work to be done or quantities of materials to be furnished under the contract. The approximate quantities are not to be used in making payments, but payments will be made upon quantities determined by the chief engineer as the work progresses.

Therefore the quantity of work stated in the esti-

mates as probably necessary has no relation to the amount of pay which the contractor was to receive. He is to be paid for the amount of work which he does, and not for the amount of work which the engineers estimated that he would probably be required to do.

The claim made by O'Rourke in the suit against the city was not allowed, on the ground that it was for work which by his contract he was bound to do, and that he had been paid all that he was entitled to under the contract.

The claim presented before the referee was for work which O'Rourke did not do, but which he claimed he would have done if a change in the method of performance had not been made.

The court finds:

1. That the city was under no legal obligation to pay O'Rourke as claimed.

2. That the city was under no moral obligation to pay O'Rourke either for the cost of doing the work "in the dry" or for the work which he claims he would have done had the sewer been built "in the wet," but which he did *not do.*

In O'Rourke v. Philadelphia, 211 Pa. 79, a case somewhat similar to the present one, Mr. Justice Mestrezat said:

"There is but a single question involved in this appeal, and it is, whether councils can, by the ordinance presented as the basis of this claim, bind the city to pay for work done in pursuance of a written contract for which the city has paid the price stipulated in the contract. To state the question would seem to be a full and complete answer to it against the contention of the plaintiff."

This language is appropriate to the present case, except that the claim here is for work which the contractor did not perform.

For the reasons stated, the relief prayed for in the bill will be granted.

Counsel will prepare a decree. The defendants will pay the costs.

The court found, inter alia, as follows:

"6. The contractor built the sewer in a good and workmanlike manner, according to the contract as modified by the above letters, and was paid for all the items of work entering into the construction of the sewer, according to the prices named in his proposal, a total amount of $161,096.30."

"10. If the sum now claimed by virtue of the ordinance in suit is the amount of money which the contractor spent in the construction of dams, shoring, false work and other temporary work in connection with the construction of the sewer from Richmond street to the bulkhead; then under the contract the unit prices therein specified included payment for all of these items. And the contractor, therefore, was paid for them by the express terms of the contract, and there is no moral obligation on the part of the city to pay him or his representatives any of the sums claimed."

Exceptions were filed by the executors of the estate of Michael O'Rourke, which were afterwards dismissed and the following decree entered:

And now, November 20, 1913, this cause came on to be further heard at this term, and was argued by counsel, and upon consideration thereof, it is ordered, adjudged and decreed as follows, viz:

That John M. Walton, city controller, be perpetually restrained from countersigning, and the City of Philadelphia from paying, any warrants drawn to the order of the estate of Michael O'Rourke, deceased, in payment of the sums mentioned in the ordinance of March 16th, A. D. 1911, annexed to the bill of complaint as Exhibit A, or any of them; and that plaintiffs shall recover costs.

The executors of the estate of Michael O'Rourke, deceased, appealed.

*Errors assigned* were in dismissing exceptions to the findings and the decree of the court.

*John G. Johnson,* with him *John L. Burns,* for appellants.—The contractor did extra work which he was not bound to do, of which the city received the benefit, and for which it was morally bound to pay: Com. ex rel. v. Walton, 236 Pa. 220.

*Thomas Raeburn White,* for appellees.—O'Rourke was fully paid for everything which he did under the terms of his contract with the city, and councils cannot give him more: O'Rourke v. Philadelphia, 211 Pa. 79; Cunningham v. Dunlap, 242 Pa. 341.

PER CURIAM, May 4, 1914:

The court below found as a fact that appellants' decedent, who had a contract with the City of Philadelphia in connection with the construction of a sewer, had been fully paid for all the work called for by his contract, and that, as he had done nothing additional, there was no moral obligation resting upon the city to pay him more. Under this finding, which is not to be disturbed, because sustained by the evidence, the ordinance of the city councils, awarding him more, was invalid: O'Rourke v. Philadelphia, 211 Pa. 79; Cunningham v. Dunlap, 242 Pa. 341.

Decree affirmed at appellants' costs.