CHARLES J. SCHUCK, Judge.
Claimant Junior Coole was tried and convicted on the charge of obtaining money under false pretenses by uttering and passing worthless checks. His trial and conviction took place in Jackson county, West Virginia, in November of 1939, and after refusal by the trial court to set aside the verdict of the jury and grant a new trial, the claimant was sentenced to the state penitentiary for a term of from two to ten years. An appeal to the Supreme Court having failed, claimant was conveyed to and received at the penitentiary on or about March 26, 1940, and remained confined there as a prisoner for a period of six months, at which time he was released on parole, and, subsequently, on the seventeenth day of June, 1948, he was granted a full pardon by The Honorable Clarence W. Meadows, Governor of the state of West Virginia. The pardon sets forth the reasons for the Governor’s action and contains the statement, in effect, that an investigation, made after the conviction of claimant and his confinement in the penitentiary, indicates a miscarriage of justice which justifies his release and full pardon. Claimant had also been confined in the county jail at Ripley from the time of his arrest in November, 1939, to the day he was taken to the penitentiary, a period of approximately five months, during all of which time he was, of course, treated as a *208 prisoner and subjected to all the rules and discipline of the jail authorities.
The checks in question, and used as the basis for the conviction of claimant, were similar in handwriting and bore every evidence of emanating from the same source and as having been written by one and the same person. This fact is highly important in the light of subsequent events and the investigation by the state police authorities that had been set in motion prior to the conviction of claimant and continued after his confinement in the penitentiary, and which finally led to his pardon and release. It must also be borne in mind that for several years after claimant was released on parole, and before his pardon, he was subjected to all the rules and regulations applicable to the actions and freedom of a parolee, and was obliged to report to and keep in touch with the proper parole officer and- to limit his travel or work to the territory fixed by the parole authorities, all of which added to his disgrace and degradation.
We come now to the startling and extraordinary facts that developed from the investigation heretofore refered to, and which ultimately led the Governor to grant a full and complete pardon to claimant, and which facts have since become the foundation on which claimant bases his claim before this court.
Among the state police officers called to assist in bringing about the arrest and conviction of the person circulating the worthless checks in Jackson county at the time was one R. I. Boone, by rank a master technical sergeant, specializing in firearms, identification and document examination, and commonly known as the handwriting expert of the state police department. He had seen and examined the questionable checks before the trial of the claimant, was subpoenaed as a witness by the state, and yet, for some unaccountable reason, was not used as such by the prosecuting attorney in charge. He had not seen *209 claimant’s handwriting until the day of the trial at Ripley, and after obtaining specimens thereof concluded that the checks had not been written by claimant, and he is now of the opinion that this information was conveyed to the prosecuting attorney at the beginning of or during the trial. (Record pp. 62-63). In any event he was not called as a witness and was dismissed from further attendance.
During the incarceration of claimant in the jail at Ripley and before he was taken to the penitentiary, worthless checks were uttered and passed on several merchants in Ravenswood, located in Jackson county. The then sheriff of Jackson county, one Clarence F. Myers, and a witness before this court, as such sheriff in charge of the custody of claimant, took claimant to Ravenswood, West Virginia, where he was identified as the man who had uttered and passed the worthless checks, when in fact he was then and had been confined in jail at the very time, and it would have been absolutely impossible for him to have committed the acts in question. (Record p. 8). That the merchants at Ravenswood were honestly mistaken there can be no doubt, but that the prosecuting attorney should fail to heed or consider the information obtained by the then sheriff, Myers, and which he imparted to the prosecuting attorney, is beyond our comprehension. Several more such bogus checks made their appearance and were uttered and passed during the period when claimant was confined either as a prisoner at the jail or at the Mounds-ville prison, and, as testified to by C. A. Hill, the circuit clerk of Jackson county, all this information was passed to the proper authorities, but to no avail. (Record pp. 54-55-56-57).
Another witness, Paul R. Pritchard, a corporal in the state police department, who arrested claimant and later found, as he stated (record p. 121) that the checks “still came out after he went to the penitentiary” concluded that claimant could not possibly be guilty of the crime or crimes for which he was indicted in Jackson county, and has since *210 concluded, from the investigations made, that the man guilty of the crimes for which claimant was convicted is now confined in the Ohio state penitentiary, at Columbus, Ohio. (Record pp. 115-116).
Returning now to the witness Boone, he testified, in answer to the question as to whether the checks in question had been written by claimant, “That in my opinion he never did. It has always been my opinion that he could not have written them or endorsed them.” (Record p. 67). And so, with this opinion in mind, and being an able and conscientious officer, as he must have impressed all who heard him testify before us, he went to the Ohio prison to interview and obtain specimens of the handwriting of the man under suspicion of having uttered and passed the worthless checks in and about Jackson county in our own state, and he unequivocally stated and testified (Record pp. 67-68) that the man who wrote and uttered the checks on which claimant was convicted is now a prisoner in the Ohio penitentiary, and known as Edward Allen, thus exonerating claimant from all guilt insofar as the Jackson county charges were concerned and showing clearly, when connected with the mass of other testimony, that he was unjustly, wrongfully and improperly convicted, and that the witnesses who testified against him though honestly convinced were, nevertheless, honestly mistaken, and that his testimony to the effect that he had never been in Ripley or Jackson county before the day of his arrest is fully borne out by the testimony presented.
Giving due consideration to the foregoing facts, we are forced to the conclusion that the claimant was wrongfully convicted, that he was innocent of the charges set forth in the indictment, and that the person who actually uttered and passed the checks has not as yet been apprehended by the state of West Virginia, but is at the present time an inmate of the Ohio state penitentiary, and that, consequently, claimant was obliged to undergo long imprisonment for a crime he never committed.
*211 We are therefore now concerned in determining whether the foregoing undisputed facts create an obligation on the part of the state sufficient to warrant an award in money which may, in a degree, give some satisfaction and compensation to the claimant for the grievous wrong that has been done to him. The state, being protected by the so-called “immunity” clause of our constitution and not subject to suit in our courts of law except indirectly within very narrow limitations, created the state court of claims as a special instrumentality to hear and determine claims and demands which the state as a sovereign commonwealth should in equity and good conscience discharge and pay; in other words, the payment and discharge of a claim by reason of a moral obligation resting on the state and because of its very nature requiring an award in justice, equity and good conscience.
Our Supreme Court of Appeals in the case of State ex reL. CasHman v. Sims, 43 S.E. (2d) 805, at page 814, in considering this all-important question now under consideration, states the rule as follows:
“The sound and just general rule by which a moral obligation of the State in favor of a private person may be recognized, and for the payment of which a valid appropriation of public funds in the interest of the public may be made by the Legislature, requires the existence of at least one of these components in any particular instance: (1) An obligation or a duty, by prior statute created or imposed upon the State, to compensate a person for injury or damage resulting to him from its violation by the State or any of its agencies, or to compensate him for injury, damage, or loss sustained by him in or by his performance of any act required or authorized by such statute; or (2) an obligation or a duty, legal or equitable, not imposed by statute but created by contract or resulting from wrongful conduct, which would be *212 judicially recognized as legal or equitable in cases between private persons.” (Italics supplied.) .
Now, there being no prior statute created to compensate one for injury or damage as outlined in the Cashman decision, supra, we must necessarily look to the second part of the rule as stated, namely, “An obligation or a duty, legal or equitable, not imposed by statute . . .,” to determine whether or not in the instant case a moral obligation is created, sufiiciently founded in justice and equity and by the very nature of the case or claim and the facts upon which it is based, requiring an award for the injuries done. We do not believe that the Supreme Court in the Cashman case, supra, meant to say that wrongful conduct to create a moral obligation must be vicious and evil in its intent, but rather that an irreparable injury done one by the state or any of its agencies without any element of malice or feeling may be sufficient to impose a moral obligation on the state to make some restitution if possible for the wrongful act complained of by a claimant against the state. If the state commits an act which injures a person and which act is afterward shown to have been wrong, erroneous and unjust, and if the act or acts complained of had occurred between private persons or individuals for which the aggrieved person would have an action at law, then a moral obligation is created which the state should be called upon to discharge and satisfy. Can there be any element of doubt as to a moral obligation having been created by the facts here under consideration? Deprived of his liberty and freedom for a long period of time — a liberty and freedom constituting the greatest and most precious heritage of man in a democracy such as ours, subjected to the lowest form of degradation, branded by the felon’s indelible mark, he forever enters the class of the “untouchables”; shunned, avoided and despised by his fellow men and ostracized from the society of those who had hitherto been his companions and friends. No greater harm or more serious *213 injury could befall any man than the unwarranted, improper conviction of the claimant, innocent as he was of the charges brought against him.
In the case of State ex rel. Adkins v. Sims, Auditor, 34 S.E. (2d), 585, the Supreme Court held as follows:
“In order to validate a legislative appropriation of public money for private use it must affirmatively appear that the Legislature in making the appropriation has found that it was necessary in order to discharge a moral obligation of the State.”
Again we may ask, what, then, is a moral obligation? And the answer seems to be, one that cannot be eniorced by action but is binding on the persons who incur it in conscience and according to natural justice. An obligation which one owes in equity and good conscience but which cannot be enforced at law. A duty which would be enforceable at law as between man and his fellow man were it not for some positive rule which exempts the party in that particular instance from legal liability. Longstreth v. City of Philadelphia, 91 A. 667, 245 Pa. 233; MacDonald v. Tefit-Weller Co., 128 F. 381, 385, 63 C.C.A. 123, 65 L.R.A. 106. Words and Phrases, Vol. 27, pp. 551-552, and cases cited.
We repeat that in our opinion a consideration of the facts fully justifies the finding of a moral obligation devolving upon the state which in equity and justice should be discharged. Can the Legislature make a valid appropriation to cover an award, if made, in favor of the claimant? Courts generally have held that while the Legislature may not sanction a gift of public moneys for private purposes, it may in certain instances acknowledge the justice of a private claim against the state and provide for its audit and allowance by a court of claims, providing that the claim appears to the judicial mind and conscience to belong to a class of claims concerning which in the exer *214 cise of a wide discretion the Legislature might reasonably say are founded in equity and justice and involve a moral obligation upon the part of the state which the state should satisfy. Farrington v. State, 248 N. Y. 112. To the same effect are Williamsburg Savings Bank v. State, 248 N. Y. 231; Munroe v. State, 223 N. Y. 208.
With the foregoing decisions we are constrained to agree and feel that courts generally throughout our country sustain this view.
The state relies upon and has submitted for our consideration the case of Allen v. Board of State Auditors, 122 Mich. 324, a case in some respects resembling the one under consideration. However, there are a number of distinguishing features, namely, in the Michigan case no appeal was asked for after conviction; the pardon granted was not on the ground of the innocence of the accused as in the instant matter; the application for relief was made nine years after claimant was released; it was an apparent attempt to have the board of auditors find whether or not claimant was guilty or innocent, whereas in the instant case the innocence of the claimant is definite and unquestionable and so regarded by all, including the Governor and officers and officials who have had any contact with the case or claim in any way or manner.
We come now to the matter of damages, and while in our judgment no award can be sufficient to pay the claimant for the unwarranted, deplorable and irreparable injury that has been done to him, we feel that a substantial award is required to satisfy the ends of justice. In considering the amount of the award we are not unmindful of claimant’s subsequent plea of guilty, conviction and imprisonment in Ohio for failure to have sufficient funds on deposit to meet the amount of a check drawn thereon, and while this conviction may mitigate damages it cannot relieve the state of West Virginia of its obligation to claimant. It' is within the range of possibility to assume from all the facts that if claimant had not been falsely charged *215 and convicted in Jackson county he would perhaps not have been called upon to answer the charge in Ohio, but would have been allowed to settle for the difference between the amount on deposit in the bank on which the check was drawn and the amount of the check itself.
After a most careful consideration of all questions and matters involved, reviewing the facts, the nature of the charges, the conviction, sentence and imprisonment of claimant, the great and irreparable injury to him, and his absolute innocence, we are of the opinion that an award in the amount of ten thousand dollars ($10,000.00) should be made, and we therefore recommend to the Legislature (1) either the necessary appropriation to cover the amount of the award, or (2) the passage of a special act, as was done in New York state recently in a case based on similar facts. Bertram M. Campbell v. State of New York.