Harbold *v.* Reading, Appellant.

254

Argued January 8, 1946; reargued May 28, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Chas. W. Matten,* with him *J. P. Wanner,* City Solicitor, and *Matten & Matten,* for appellant.

*George B. Balmer,* with him *Zieber & Snyder,* for appellee.

Opinion by Mr. Justice Horace Stern, November 25, 1946:

This action represents an attempt to impose an absolute liability on the City of Reading for the payment of bonds which expressly provided that no such liability should exist, such payment being directed, however, by a validating Act of May 26, 1943, P. L. 660.

In 1932 the city enacted an ordinance authorizing the paving and curbing of Kenhorst Boulevard and Old Wyomissing Road. The ordinance provided that the work should be paid for and assessments levied on the abutting properties should be collected in the manner provided by an ordinance of 1925. According to the latter the contractor was to be paid from amounts collected by the City Treasurer from the abutting property owners, and "the City of Reading shall under no circumstances be held responsible for the payment of any part of the cost of said improvement, except as to the cost of paving intersections of streets, the paving and curbing in front of properties exempt by law from the payment of the cost of such improvements, and the amounts actually received from the assessments by the City Treasurer". It was provided by section 1908 of the Third Class City Law of June 23, 1931, P. L. 932, that, where the whole or any part of the cost of an improvement was to be paid by assessments upon the properties abutting or benefited and the agreement with the contractor called for his payment from such assessments, the city should not be otherwise liable "whether said assessments are collectible or not".

A contract having been entered into in accordance with these provisions, the work was completed on June 5, 1933, at a cost of $68,551.93. For the portion for which it was responsible there was paid by the city $20,054.06; the remainder (less the sum of $497.87, which was given to the contractor in cash) was paid by the issuance on June 21, 1933 of 48 "Improvement

Bonds", each in the sum of $1000, and each containing the following provision: "This bond, principal and interest, is based solely and rests alone for its security and is payable only out of the assessments made and levied upon the properties benefited by the local improvement (street improvement) for which this bond is issued and from no other fund. It is expressly understood that the City of Reading is to be liable only for the amount collected on the said assessments . . .".

Most of these bonds were ultimately redeemed out of the moneys collected on the assessments, but 9 of them, of which 7 are held by plaintiff, remain unpaid, together with interest thereon from June 22, 1943. As it appeared extremely doubtful whether sufficient funds could be realized out of the liens which were filed on the abutting properties, plaintiff brought the present suit in assumpsit against the city, basing his claim partly upon the Act of May 26, 1943, P. L. 660, and partly upon a contention that the city was negligent in failing to effect collections from the property owners.

The Act of May 26, 1943, P. L. 660, provides that whenever, prior to January 1, 1942 "any municipal corporation has, in good faith, issued bonds or other obligations for the payment of the cost of a public improvement on the assumption that such bonds were not debts of the municipality within the meaning and intent of article nine, section eight of the Constitution, for the reason that such bonds or obligations were secured or to be secured by assessments against property benefited by such improvement, and were to rest alone for their security and payment upon such assessments, such bonds and obligations are hereby ratified, confirmed and made valid and binding obligations and debts of the municipality . . .".

The court below, one of the judges dissenting, held that this act was constitutional,—a decision which we are now called upon to review.

It is important at the outset to realize the exact change that was effected by this "validating" statute. Under the terms of the bonds as originally issued the City of Reading was practically nothing more than an agent or trustee to make the assessments and to collect from the abutting property owners and pay over to the contractor or to the assignees of the bonds the funds due under the contract; it could itself become liable for the payment of the bonds only if guilty of negligence in the performance of its duties as such quasi agent or trustee; the source of payment was limited strictly to the assessments, and the credit of the municipality was in nowise involved. By virtue of the statute, however, the city became an absolute debtor on the bonds and the credit of the municipality and its complete taxing power were placed at the disposal of the bondholders as the source from which to effect payment. The latter were thus granted a pure gratuity, a windfall, by which money was legislated out of the pockets of the taxpayers of the city for the private benefit of the contractor or the assignees of the bonds as to none of whom was there any obligation whatever, legal, equitable, or moral, to justify such a grant. The city ordinances, the Third Class City Law, the contract, and the bonds themselves, all plainly specified that the city's obligation was limited; the bonds were accepted with full realization of that fact, and the contractor received exactly what the contract provided that he should receive. Indeed it is obvious that if the parties had contemplated an unlimited municipal liability it is not likely that the bonds would have borne interest, as they did, at the high rate of 5% per annum. No consideration or benefit of any kind was received by the city in return for the liability imposed upon it, nor was any public purpose thereby subserved,—not even, as it might be claimed, to establish a better credit with contractors in general, because by the Municipal Borrowing Law of June 25, 1941, P. L. 159, section 214, the future issuance of such "improve-

ment bonds" by municipalities had been forbidden, and only bonds pledging the full faith and credit of the municipality were thereafter to be issued.

In view of its provisions as thus analyzed, was this act constitutional? Admittedly the original contract for paving and curbing the streets might have provided for the payment of the entire cost by the city (Third Class City Law of June 23, 1931, P. L. 932, section 2931), but since, in fact, the contractor was to receive payment only from the abutting property owners, could the legislature, by its mere fiat, subsequently impose upon the city an absolute liability purely for the private benefit of the contractor or those to whom the bonds originally issued to the contractor had been assigned?

Article III, section 11 of the Constitution provides: "No bill shall be passed giving any extra compensation to any . . . contractor, after services shall have been rendered or contract made . . .". Article IX, section 7, provides: "The General Assembly shall not authorize any . . . city . . . to obtain or appropriate money for, or to loan its credit to, any corporation . . . or individual".

It is important to note that we are not dealing in the present case with a statute which provides for the payment of a claim not legally recoverable merely because of some technical defect in the legislation which authorized it or because it was incurred without the previous authority of law, but supportable as an equitable or moral obligation. Such an obligation might exist where a contractor did not, for some legalistic reason, receive what the parties had agreed in the contract he should receive. A moral obligation has been defined as one "which cannot be enforced by action but which is binding on the party who incurs it, in conscience and according to natural justice," or as "a duty which would be enforceable by law, were it not for some positive rule, which, with a view to general benefit, exempts the party in that particular instance from legal liability": *Bailey*

*v. Philadelphia,* 167 Pa. 569, 573, 31 A. 925, 926, 927; *Justice v. Philadelphia,* 37 Pa. Superior Ct. 267, 272. Notwithstanding the constitutional provisions above quoted, it is well established in our own State, as well as generally elsewhere, that a claim supported by such a moral obligation and founded in equity and justice, even though not legally enforceable, may be recognized by the legislature and made collectible either from the State itself or any of its political divisions; the legislature may compel municipalities to adopt and discharge such obligations and to exercise the power of taxation for that purpose. Illustrations of the application of this principle abound in our reports.[1] But while it is thus

---

[1] Illustrations: *Lycoming v. Union,* 15 Pa. 166 (act providing for reimbursement to a county by other counties of expenses incurred by it in trying cases removed from such other counties); *Weister v. Hade,* 52 Pa. 474 (act reimbursing citizens who had advanced money to pay bounties to volunteers); *Hilbish v. Catherman,* 64 Pa. 154 (act repaying subscriptions made by citizens to pay for recruits); *Commonwealth to use v. Marshall,* 69 Pa. 328 (act validating a street improvement contract made under an ordinance which was defective because unrecorded); *Melick v. Williamsport,* 162 Pa. 408, 29 A. 917 (act validating an ordinance under which services had been rendered by a tax assessor); *Bailey v. Philadelphia,* 167 Pa. 569, 31 A. 925 (act providing for the payment of a school teacher for services rendered under an unauthorized appointment); *Commonwealth ex rel. v. Walton,* 236 Pa. 220, 84 A. 766 (act providing for payment for work done by a contractor under a municipal contract suspended by reason of equity proceedings and lack of appropriations); *Vare v. Walton,* 236 Pa. 467, 84 A. 962 (ordinance for the payment of a municipal contractor for work done under an allegedly illegal contract); *Kennedy v. Meyer,* 259 Pa. 306, 103 A. 44 (act providing for payment for work done in constructing a highway tunnel for a county under an act which had been held unconstitutional); *Sambor v. Hadley,* 291 Pa. 395, 140 A. 347 (act authorizing the City of Philadelphia to pay debts contracted by the Sesqui Centennial Association for a celebration for which the city had pledged its honor, faith and credit); *Palmer's Appeal,* 307 Pa. 426, 161 A. 543 (act validating defective proceedings to increase a municipal debt, and the bonds issued in pursuance thereof); *Justice v. Philadelphia,* 37 Pa. Superior Ct. 267 (ordinance for the payment of a municipal

"competent for the legislature to compel municipal corporations to recognize and pay debts or claims not binding in strict law, and which, for technical reasons, could not be enforced in equity, but which, nevertheless, are just and equitable in their character and involve a moral obligation" (Dillon, Municipal Corporations, (5th ed.) vol. 1, p. 222, §123), power has never been judicially conceded in this State to a legislature to appropriate money or loan the public credit, or compel a municipality to make such a loan or appropriation, merely for the benefit of private corporations or individuals, where no such equitable or moral obligation exists and no public purpose is thereby advanced.

In *Tyson v. School Directors of Halifax Township*, 51 Pa. 9, the question was whether an act could properly authorize the school directors of a township to levy a tax to reimburse a "Bounty Association" for money expended by it to procure volunteers to fill the quota of the township. The court said (p. 22) that the decision depended upon whether the Association had paid its money to free its own members from the draft or whether the reimbursement was for advances made for the benefit of the township and with an understanding that it was to be returned to those contributing; in the former event "Such an enactment would not be legislation at all. . . . it would much more resemble an imperial rescript than constitutional legislation; first, in declaring an obligation where none was created or previously existed; and next in decreeing payment by directing the money or property of the people to be sequestered to make the payment. The legislature can exercise no such despotic functions . . ."

In *Faas v. Warner*, 96 Pa. 215, an act of assembly required a county to pay the debt of a sheriff which

clerk for services rendered under a defective appointment) ; *Walthour v. McDowell*, 109 Pa. Superior Ct. 118, 165 A. 746 (resolution of the salary board of a county paying a tax assessor for services rendered under an illegal appointment).

he had contracted for the purpose of supplying prisoners in jail with bread. It was held that the act was unconstitutional and void, as the debt was the personal debt of the sheriff. The court said (pp. 217, 218) : ". . . It thus appears that the petitioner's claim was purely a personal one by himself against Woods, and further that there was not even a shade of obligation, legal or moral, on the part of the county to pay this debt. In such circumstances an act of the legislature directing the county to pay it is of no more validity than would be an act directing the county to pay the debt of any private citizen. Such legislation is void for want of constitutional power to enact it."

In *Supervisors of Sadsbury Township v. Dennis,* 96 Pa. 400, it was declared that, while an act of assembly could provide a remedy for the enforcement of a pre-existing liability, it could not impose upon a county a liability which had no previous existence.

In *Strock v. Cumberland County,* 176 Pa. 59, 34 A. 352, it was held that where an order of court had fixed the compensation to the sheriff for boarding vagrants, and board had been furnished under that order, the court could not subsequently increase the compensation so as to cover the board furnished during the continuance of the previous order. The court said (pp. 62, 63, A. pp. 352, 353) : "There was certainly no obligation, legal or moral, to give him [the sheriff] more than was due him, and if the legislature could not do it in the one case [referring to the decision in *Faas v. Warner,* 96 Pa. 215] the court cannot do it in the other. . . . While it is competent for the court to fix the compensation for the future, . . . and while it is true that an order may embrace past services if there has been no previous order made, or if exceptional circumstances raise a moral obligation, we cannot agree that where the compensation has been fixed by a previous order under which the service has been rendered, it can be increased for the same services by a subsequent order."

In *O'Rourke v. Philadelphia,* 211 Pa. 79, 60 A. 499, where a contractor under a municipal contract did the work specified therein and received the stipulated price, it was held that he could not recover additional compensation for work included in the contract although a city ordinance was passed appropriating money for the payment of such work.

In *Cunningham v. Dunlap,* 242 Pa. 341, 89 A. 129, it was held that an ordinance of council to compensate contractors for work done was invalid so far as it included any items which the contractors were obligated to furnish for the consideration provided in their contract. The court said (p. 345, A.p. 130) that the Act of May 23, 1874, P. L. 230, which permitted an ordinance, if passed by a two-thirds vote of both councils, to give extra compensation to a contractor after services had been rendered or contract made, was intended only to permit a city to pay for benefits actually received but not embraced or provided for in the contract. "In other words, it enables a city to pay an honest debt to a contractor under a written contract if two-thirds of the membership of councils, with the approval of the mayor, feel that it ought to be paid as a moral obligation, though, as a legal one, it has no existence. But while this is true, it is equally true that there is no authority in councils to direct extra payment for any work or materials which are included in a written contract with the city. For what is done under such contract the contractor can receive from the municipal treasury only what the contract stipulates is to be paid to him, and councils cannot give him more."

In *Longstreth v. City of Philadelphia,* 245 Pa. 233, 91 A. 667, it was held that a city has no power to appropriate by ordinance sums of money claimed by a contractor to be due him for extra work where there is no moral obligation to make such payment; accordingly the city authorities, at the suit of taxpayers, were enjoined by a court of equity from making the payment

directed by the ordinance. The court affirmed the opinion of the court below in the course of which the latter said (p. 236, A. p. 667) : "If the city was under any legal or moral obligation to pay this claim, the ordinance is valid. If there is no obligation, legal or moral, upon the city, then the ordinance is an attempt to make a gift of the city's money, and is void, as being beyond the power of councils."

In *Edwards v. McLean*, 23 Pa. Superior Ct. 43, it was held that an act which granted compensation to constables for services rendered prior to its enactment and for which the compensation previously authorized had been paid, was unconstitutional and void.

The decisions in other jurisdictions are in accord with the views thus expressed by our own courts.[2]

---

[2] *Illustrations: Hoagland v. Sacramento*, 52 Cal. 142, 150 ("While the legislative power may, as it frequently does, interpose to furnish a remedy or remove an impediment which prevents the enforcement of a legal or equitable right or duty already existing, it cannot, even against a municipal corporation, *create a claim* without the consent of those who are to be taxed with its payment. Such a procedure, while taking on the form of a statutory enactment, would amount to mere spoliation.") *Conlin v. Board of Supervisors*, 114 Cal. 404, 46 P. 279; *Oregon Short Line R.R. Co. v. Berg*, 52 Ida. 499, 16 P. 2d 373; *City of Chicago v. Brede*, 218 Ill. 528, 75 N.E. 1044; *Midland Lumber Co. v. Dallas City*, 276 Ill. 172, 114 N.E. 580; *Berman v. Board of Education of Chicago*, 360 Ill. 535, 542, 196 N.E. 464, 467, 468 (". . . it seems clear that tax anticipation warrants are not debts and do not represent direct legal obligations of the municipality issuing them. It follows that an appropriation and levy for their payment must fail, since not for a corporate purpose. Where the money is not due as a result of any promise, contract or debt of the municipality, little justification can be found for an appropriation to pay private holders of tax anticipation warrants the moneys which they have failed to collect from the sources to which such collections are exclusively confined. An appropriation for such a purpose certainly could not be deemed an appropriation for a corporate purpose. Another constitutional limitation upon the power of the General Assembly to vest the proposed taxing power in the corporate authorities here is found in the due process clause. . . . This section is violated if a citizen's money is taken from him under

The Act of May 26, 1943, P. L. 660, is unconstitutional because it violates the clauses of the Constitution

the guise of a tax for any other than a public purpose".) ; *Craft v. Lofinck,* 34 Kan. 365, 374, 375, 376, 8 P. 359, 365, 366 ("But the question still remains to be decided: May not the legislature impose a legal obligation or liability upon the people of the detached territory to assist in paying said bonds, although they may not be under any moral obligation to do so? This question must be answered in the negative; and it certainly requires no argument and no citation of authorities to support such a decision . . . If the detached territory is under no moral obligation to assist in paying the bonds, we think the courts may say so; . . . The question is in its nature judicial, although in the first instance it may also be legislative; and the courts must determine it whenever it is fairly presented to them. . . . The legislature cannot, by the mere forms of legislation, create a legal demand where no demand, legal, moral or equitable, existed before. Such is not legislation. It is not the passing of laws. It is not the legitimate action of any tribunal; and it is utterly beyond the power of the legislature.") ; *Forman v. Sewerage and Water Board of New Orleans,* 135 La. 1031, 66 So. 351; *Board of Supervisors v. Cowan,* 60 Miss. 876, 884 ("It is not a legitimate exercise of legislative power to impose the burden of taxation on a county to pay what it does not owe in any just sense. A. cannot be required to contribute of his means to B, for services rendered to private individuals, and a legislative declaration that such services constitute a just demand against a county is not conclusive, but must be finally passed on by the courts, for this is in its nature a judicial question.") ; *Stanley v. Jeffries,* 86 Mont. 114, 284 P. 134; *Bush v. Board of Supervisors,* 159 N. Y. 212, 216, 217, 53 N.E. 1121, 1122 ("The legislature cannot authorize taxation for the purpose of making gifts, or paying gratuities to private individuals. It is quite clear that this was the purpose of the act in question. The individuals for whose benefit the tax was to be levied under the act had no claim, legal or equitable, against the town or county where the money was to be raised by taxation. . . . The statute in question provides for the imposition of the tax upon the town to raise money for the payment of claims which there was no legal or moral obligation on the part of the town to pay, and hence it is in conflict with the provision of the Constitution above referred to which forbids the town from giving any money to or in aid of an individual.") ; *Stemmler v. Mayor of New York,* 179 N.Y. 473, 483, 72 N.E. 581, 584 ("The statute in question clearly falls within the inhibition of the Constitution . . . as it required the city of New York to pay an amount for which it was not liable, legally nor in equity or justice.").

above referred to,—Article III, section 11, which forbids the passage of a bill giving any extra compensation to a contractor after the making of the contract, and Article IX, section 7, which forbids the General Assembly from authorizing any city to appropriate money for, or to lend its credit to, any corporation or individual. Although the act did not grant a greater amount of compensation than that provided for in the original contract, it did in reality assure to the contractor or to the assignee bondholders the actual receipt of more money than would have been forthcoming from the limited source from which the contractor had agreed to accept payment,[3] and, as the legislature could not constitutionally *authorize* the city to appropriate money or loan its credit to this contractor or to the plaintiff bondholder, a fortiori it could not *compel* the city to make such a loan or appropriation. Even apart from express constitutional restrictions, while legislative authority over municipal corporations is extremely great, there are, nevertheless, some inherent limits to its power in that regard springing from the very nature of our government and from our general conception of governmental power. It would be intolerable if any legislative body, municipal, state or national, were to be allowed to make a grant to individuals of public funds in the absence of any legal, equitable or moral right thereto. Nor can the legislature, under the guise of a moral obligation, enact such legislation if it is abundantly clear that no such obligation exists; whether or not there is any ground for claiming its existence is a question which, though in the first instance for the legislature, is, on final analysis, a judicial one. In the present case, as already stated, there is not the slightest basis for a

---

[3] A somewhat analogous situation would be if a contract provided for the payment of a certain sum in Confederate or other depreciated money, and this was later changed to the payment of the same sum in American currency. The amount receivable would be the same, but the amount actually received would be much greater.

claim that the municipality was under obligation of any kind to the contractor or to the bondholders to whom the bonds have been assigned.

While, therefore, it should be clear that liability cannot be imposed in this action on the City of Reading merely because of the Act of May 26, 1943, P. L. 660, plaintiff did not rely wholly upon that statute but alleged—and offered testimony to support the claim— that the city had been negligent in the performance of its duty to make the collections from the abutting property owners necessary to liquidate the bonds. The evidence indicated that there was no failure on the part of the city to make valid assessments, to file liens within the proper times, or to issue the necessary writs of scire facias to revive the liens, but that does not necessarily mean that the city was thereby relieved of its liability under the covenant implied in the bonds that it would pursue all reasonable measures to effect collection. It was the additional duty of the city to press the liens to fruition within a reasonable time, and, for that purpose, to enter judgments thereon, to issue writs of execution, and to expose the properties to sheriff's sales: *Dale v. City of Scranton,* 231 Pa. 604, 80 A. 1110; *Price v. Scranton,* 321 Pa. 504, 184 A. 253; *Palmer v. Erie,* 337 Pa. 5, 9 A. 2d 378; *Nagle Engine & Boiler Works v. Erie,* 350 Pa. 158, 161, 38 A. 2d 225, 226. Here ten years had gone by from the original filing of the liens, during which time delinquent taxes may have accrued to wipe out any realizable value from the properties, and the only defense which the city could properly offer to its failure to proceed would be that the amounts likely to have been obtained from sales on execution would have been less than the costs involved: *First Catholic Slovak Union v. Scranton,* 311 Pa. 500, 167 A. 34; *Bessemer Investment Co. v. City of Chester,* 113 F. 2d 571, 576, 577. Nor did the city institute any actions of assumpsit against the owners of the abutting properties within three years after the completion of the improvement, as

it was authorized to do by section 4601 of the Third Class City Law of June 23, 1931, P. L. 932; such failure also might constitute negligence on the part of the city (*Palmer v. Erie*, 337 Pa. 5, 12, 9 A. 2d 378, 381, 382; *Nagle Engine & Boiler Works v. Erie*, 350 Pa. 158, 161, 38 A. 2d 225, 226) unless it were shown that because of the financial condition of the non-paying property owners such actions would probably have been futile. There was no legal requirement upon plaintiff to offer to indemnify the city against costs, for it was the duty of the city itself to issue executions and institute proper actions unless it were fairly obvious that the costs, even though a prior claim upon the funds realized, would not be salvaged. The jury should have been allowed to pass upon the question whether the failure of the city to exhaust all possible measures to effect collections from the property owners, was, under the circumstances, negligence on its part, thereby making itself liable for the payment of the principal and interest of the bonds. The record must now be remanded in order that that question may be properly determined.

Judgment reversed and new trial awarded.

DISSENTING OPINION BY MR. CHIEF JUSTICE MAXEY:

I dissent from the majority opinion and agree with the court below,[1] which in an able opinion by President Judge PAUL N. SCHAEFFER, held that the Act of May 26, 1943, P. L. 660, is constitutional. The conclusion of the majority is based on a fundamental misconception or error, which in the majority opinion is given the following expression: "The latter [the bond-

---

[1] The dissenting judge of the court below contended chiefly that the Act of May 26, 1943, was invalid because it impaired the obligation of a contract, a position which we all agree is wholly untenable. He also thought that it was "class legislation". It is *not*, for it is general in its terms. See *Evans v. Phillipi*, 117 Pa. 226, 236, 11 A. 630.

holders] were thus granted a pure gratuity, a windfall, by which money was legislated out of the pockets of the taxpayers of the city for the private benefit of the contractor or the assignees of the bonds as to none of whom was there any obligation whatever, legal, equitable, or moral, to justify such a grant." I have searched the record in vain to find a single fact which supports the contention that the holders of the improvement bonds will receive a single cent more if the Act of May 26, 1943 is sustained than they will receive if it is stricken down. There is not one word in plaintiff's statement of claim which declares or even intimates what the majority opinion asserts, to wit: "As it appeared extremely doubtful whether sufficient funds could be realized out of the liens which were filed on the abutting properties, plaintiff brought the present suit in assumpsit against the city . . ." There was in this case no such "doubt" and no basis for such doubt.

Plaintiff (a bondholder) alleged that the City of Reading had failed to "bring the necessary proceedings at law necessary to compel the payment of the liens filed against the properties benefited by said improvement [of Kenhorst Boulevard]", and he claims that the City was liable *both* for its neglect of duty (and such neglect of duty is admittedly a proper basis for a city's liability) and because of the Act of May 26, 1943. Even if the latter Act had never been passed the bondholder *was sure* to get the principal and interest on his bonds for these good and sufficient reasons.

1. The abutting properties on Kenhorst Boulevard presumably constitute ample security for the payment of the liens filed against them to guarantee payment of the cost of the improvement. This presumption is founded on the fact that city properties abutting on boulevards are invariably worth more than the pro-rata cost of improving such boulevards. There is not a thing in this record which challenges that presumption and no attorney on either side advances any such argument.

2. The owners of the abutting properties are *personally* liable for the payment of these improvement bonds. The Third Class City Act of June 23, 1931, P. L. 932, Art. 46, Sec. 4601, 53 P.S. 12, 198-4601, specifically gives the municipality the right to bring suits in assumpsit within three years of the completion of an improvement against the owners of the property which abuts on the improvement.

3. If the city fails to exhaust every legal remedy for the collection of the debts evidenced by the bonds the owners of the bonds can hold the city responsible and collect the full amount of the bonds with interest: *Palmer v. Erie,* 337 Pa. 5, 9 A. 2d 378.

Inasmuch as under *either view* of the case the bondholder is going to get *what he is entitled to and no more,* the contention that the Act of 1943 "grants a pure gratuity, a windfall" has not even the faintest trace of a fact to support it.

And suppose the improvement bonds *were uncollectible* and that the city was not liable to the bondholders on account of breach of duty to collect, *what is there in the constitution* which forbids the legislature saying to the bondholders, "Since you supplied the money to improve Reading's Kenhorst Boulevard that City must in fairness and justice reimburse you for what you spent for its benefit?" The United States government because of its recognition of a "moral obligation" bestowed a few years ago $100,000 on the inventor of the Garand rifle, who had generously dedicated his invention to the public. Where is there any provision in the constitution which prevents the State of Pennsylvania from reimbursing its citizens for acts they do for the public benefit or requiring municipalities of the state to reimburse those individuals who furnished the means to build roads or bridges or other public improvements?

Another basic error in the majority opinion is expressed as follows:

"Although the act [of 1943] did not grant a greater amount of compensation than that provided for in the original contract, it did in reality assure to the contractor or to the assignee bondholders the actual receipt of more money than would have been forthcoming from the limited source from which the contractor had agreed to accept payment . . ."

There is no such "reality" in this record. How can the bondholder receive "more money" if the City *pays* the full amount of the bonds because of the liability imposed upon it by the Act of 1943 than he would receive if the city *collected for him* the full amount of the bonds from. the abutting property owners or if the city is compelled to pay the full amount because of its remissness in collecting? The majority opinion sets up a "man of straw" labeled "Additional Compensation" and then proceeds to demolish it. The issue in this case is this: Did the legislature violate the constitution when in the Act of May 26, 1943, P. L. 660, it ordered the City of Reading to assume the payment of a *debt for a public improvement.* To express the issue differently: Does the Constitution forbid the state (or any of its subdivisions) acting as any honest individual would act toward another who had at his own expense conferred a benefit upon him? What is there to prevent that state's saying to the city: "Since it was a boulevard for *your* use which was improved by money furnished by those who bought the improvement bonds, it is *you* and not the abutting property owners who should reimburse those [2] who furnished the money to pay for it."

The only test of the constitutionality of the Act of 1943 is this: Did those bondholders who furnished the

---

[2] The majority opinion makes frequent reference to "the contractor". *No contractor is a factor in this suit.* Presumably the contractor who improved the boulevard was paid from the proceeds of the sale of the improvement bonds. He got *his* money and this suit is of no concern to him.

money for the improvement of Kenhorst Boulevard *render a public service* to the City of Reading? In *Speer v. School Directors, etc., of Blairsville,* 50 Pa. 150, this court upheld the constitutionality of an Act which authorized a Borough to raise money by taxation to pay bounties to voluntéers for the Civil War. In upholding the Act Justice AGNEW said:

"The question is . . . is the purpose, . . . a public one? Does it concern the common welfare and interest of the municipality? . . . It is not a mere gift or reward, but a consideration for service . . . it is a contribution from the public treasury for a general good. . . . There is another rule which must govern us in cases like this, namely, that we can declare an Act of Assembly void only when it violates the constitution *clearly, palpably, plainly,* and in such manner as to leave *no doubt* or hesitation in our minds." (The emphasis is Justice AGNEW'S.)

Mr. Justice LINN, speaking for this court, in *Brereton Estate,* 355 Pa. 45, at 52, said (on September 30, 1946):

"The courts must give effect to the Act unless it clearly appears that the legislation is prohibited by the Constitution." Citing *Sharpless v. Mayor of Philadelphia,* 21 Pa. 147, and other cases.

In the *Sharpless* case Chief Justice BLACK, speaking ing for the court, said:

"We are urged, however, to go further than this, and to hold that a law, though not prohibited, is void if it violates the spirit of our institutions, or impairs any of those rights which it is the object of a free government to protect . . . But we cannot do this . . . The constitution has given us a list of the things which the legislature may not do. If we extend that list, we alter the instrument, we become ourselves the aggressors, and violate both the letter and spirit of the organic law as grossly as the legislature possibly could . . . if we can change the constitution in any particular, there is nothing but our own will to prevent us from demolishing it entirely . . ."

It is impossible to determine from the majority opinion *what* section of the Constitution the Act of 1943 is supposed to have violated. The majority opinion *quotes* Article III, section 11, of the Constitution and Article IX, section 7 of the Constitution *without declaring anywhere in the opinion* that the Act of May 26, 1943 *violates* either of these provisions. All that is required of anyone in order to reach the conclusion that the Act of 1943 does *not* violate these constitutional provisions is to *read* them. Article III, section 11, provides: "No bill shall be passed giving any extra compensation to any . . . contractor, after services shall have been rendered on contract made . . .". The *facts* of this case show that the Act of 1943 does *not* give one cent of "extra compensation" to "any contractor" or to anyone else. I made this clear earlier in this opinion. Article IX, section 7 of the Constitution provides that: "The General Assembly shall not authorize any . . . city . . . to obtain or appropriate money for, or to loan its credit to, any corporation . . . or individual." It is crystal clear that the Act of 1943 does not offend Article IX, section 7 of the Constitution. The mischief which Article IX, section 7 of the Constitution was designed to prevent was clearly set forth in *Com. v. Walton,* 182 Pa. 373, 38 A. 790, and in *Downing v. Erie School District,* 297 Pa. 474, 147 A. 239. In the *Walton* case Chief Justice STERRETT said:

"The constitutional provision above quoted [Article IX, section 7] . . . had its origin in the amendment of 1857, which was prompted by the growing evils of reckless and extravagant municipal subscriptions to railroads, plank roads, etc."

In the *Erie School District* case Justice SADLER said:

"The thought [underlying Article IX, section 7] was not to prevent the municipal corporation from entering into engagements to carry out a proper governmental purpose, though the incurring of indebtedness

results. (citing cases) . . . it . . . may make advances for the cost of improvements: Brooke v. Phila., 162 Pa. 123."

That the Act of May 26, 1943 requiring the City of Reading to pay for the public improvements of one of its boulevards, thereby relieving the abutting property owners from a burden which in fairness and justice *should not* have been imposed upon them in the first place is *not* putting the City of Reading as a stockholder into a hazardous business venture, a thing which Article IX, section 7 of the Constitution was enacted to prevent municipalities from doing, is so obvious as to require no argument to elucidate it.

Since it is conceded in the majority opinion that the State of Pennsylvania could have constitutionally required the City of Reading *in the first instance* to pay for these street improvements, I challenge anyone to identify *any provision* of our State Constitution which prohibited the legislature from issuing its mandate on May 26, 1943 to the City of Reading to pay for this public improvement. Jurists often say: "To declare an Act unconstitutional you got to pin it on a particular clause of the Constitution". What particular clause of the Constitution can any court "pin" with fatal effect on the Act of 1943, which Act directed the City of Reading to treat as a binding obligation the bonds issued for the improvement of its public streets and at first "secured by the assessment against the property benefited by such improvement"? When the legislature later decided that this improvement should not be charged against the abutting property owners who benefited but little, if any, from it, but that it should be charged against the City of Reading, which derived the chief benefit from the improvement, what provision of the Constitution *said* to the legislature, "You can't do that"? *There is no such provision.*

The majority opinion "boils down" to this: If one creates a public improvement for a municipality under

a contract which finds its genesis in the authority of law the legislature is *without power* to say that the first plan to make abutting property owners pay for the improvement shall be superseded by a legislative mandate that the community benefited shall pay for it, but if one creates exactly the same kind of a public improvement for a municipality under a contract which was wholly void, i. e., without authority of law, the legislature *can* make the municipality benefited pay for it. The majority opinion apparently assumes that in the latter case the municipality was "morally bound" to pay for the improvement even though the man who created the improvement was presumed to know that the contract under which he operated was unlawful, but that in the former case the municipality was *not* "morally bound" to pay for the improvement. The "moral obligation" in each case is *identical* and it arises from the fact that the municipality obtains a benefit from the improvement and that therefore it is both just and legal that it should pay for it. The *real test* in both cases *is: Did the community get the benefit of the improvement?* If it did, it has a legal right to pay for it.[3]

It would, indeed, be an anomalous provision in a constitution which would declare, and it is equally an anomalous interpretation which does declare, in effect that when a contract for a public improvement was entered into without legal authority the legislature can

---

[3] In certain mining villages in northern Pennsylvania there were for many years no water systems, but certain individuals in those villages had wells equipped with pumps. Their neighbors who had no wells used these wells and pumps to obtain water for themselves. When a pump wore out the neighbors who used the water from the well "chipped in" to buy the well owner a new pump. They felt "morally obligated" to do so because they had been deriving benefits from the well and the pump and they expected to continue to do so. A municipality which derives benefits from a public improvement is under the same kind of moral obligation to pay for it, and the legislature can without violating the constitution convert this moral obligation into a legal obligation.

by a subsequent act compel the municipality benefited to pay for the improvement (as scores of cases hold), but when a contract for a public improvement is authorized by law, said improvement to be paid for by assessments against abutting property owners, the legislature cannot later declare that because this improvement was a benefit to the public it should be paid for out of the public treasury. Since the legislature could before the improvement was contracted for, compel the municipality to pay for it, I ask, *"When and how did it lose its power to compel the municipality to pay for this improvement?"* The logical reasoning of the highest courts of this and other states in such cases is that when a piece of work is done for the public benefit the municipality benefited by it can lawfully pay for it because of its "moral obligation" to pay for any benefits it receives.

The basic error in the majority opinion finds further expression in this statement: "No consideration or benefit of any kind was received by the city in return for the liability imposed upon it, nor was any public purpose thereby subserved, . . . ." *The answer to that statement is that the city derived the benefit of an improvement to one of its boulevards by reason of work done on that boulevard which was paid for by those who purchased improvement bonds. In fairness and natural justice, the city and not the abutting property owners should bear the burden of paying for that public improvement.* The legislature showed by the Act of 1943 that it considered the City of Reading morally obligated to relieve the abutting property owners of this burden.

The moral obligation which the Legislature of Pennsylvania thus recognized is exactly the kind of moral obligation which the highest courts of more than a dozen states which have passed on this question have declared to be a constitutional basis for the legal obligation which the legislatures of these states have imposed upon the municipalities affected. With the single exception hereinafter discussed, the majority opinion in this case will

stand alone and unique as the *one* judicial opinion of the highest court of any state of the American Union [4] which holds that the legislature cannot impose upon a municipality benefited by a public improvement the obligation to pay for that improvement *after* improvement bonds have been issued in the first instance to pay for it or after certain individuals had first voluntarily assumed the obligation of paying for such improvement, as well as before such bonds have been issued or such obligations voluntarily assumed.

The majority opinion denies the existence of any moral obligation on the City of Reading to pay for this improvement to Kenhorst Boulevard. This denial is based upon a total misconception of what constitutes a moral obligation which a state legislature can constitutionally require as the basis for the payment of public moneys to discharge it. There is not one case in Pennsylvania, or as far as I can discover, in any other jurisdiction (with one possible exception (in Illinois) hereinafter discussed) which interprets the phrase "moral obligation" in this class of case as narrowly as the majority opinion interprets it. The majority opinion treats a moral obligation as *practically equivalent* to a legal obligation. They are not at all the same thing, though to serve a public purpose the state can convert a moral obligation into a legal obligation as Pennsylvania did by the Act of 1943. In *Bailey v. Philadelphia,* 167 Pa. 569, 573, 31 A. 925, this court, speaking through Justice MITCHELL, adopted this definition: "A moral obligation in law is defined as one 'which cannot be enforced by action but which is binding on the party who incurs it, in conscience and according to natural justice,' ". In applying that to this case the legal obligation which the

---

[4] Three Common Pleas Courts of Pennsylvania and a Federal District Court functioning in Pennsylvania have held such acts as the one now before us *constitutional* (as we herein later point out). There are no decisions to the contrary in this state and only one elsewhere.

state imposed on its creature, the City of Reading, to pay the cost of improving one of the city's boulevards arose out of the state's recognition of the fact that "in conscience and according to natural justice" the City of Reading should pay for the improvement. The moral obligation resting upon all municipalities to pay for their public improvements and not to force abutting property owners to pay for them was recognized by the legislature of Pennsylvania when it passed the Act of June 25, 1941, P. L. 159, section 214, forbidding thereafter the issuance of improvement bonds and requiring municipalities to assume direct responsibility for the payment of bonds issued for street improvements.

The analogy in footnote 3 of the majority opinion is so manifestly inapposite as to require no analysis to expose its fallacy. The bonds whose payment plaintiff is seeking provided for the payment of one thousand dollars. By "dollars" was meant United States dollars and not Confederate dollars or Mexican dollars. If the State Legislature had passed an act declaring that wherever the word "dollars" was mentioned in improvement bonds the phrase "English pounds" should be substituted therefor, that would be giving the bondholders more money than the bond called for and its constitutionality would justly be subject to challenge. But the legislature did not by the Act of 1943 provide for a single dollar of *extra* compensation for the bondholders. It is true that the bond declared that it "rested alone for its security . . . upon the properties benefited by the local improvement". But the law of Pennsylvania imposed the further obligation on the City of Reading to use every statutory means to collect the amount of the bonds from the abutting property owners: *Dale v. City of Scranton*, 231 Pa. 604, 80 A. 1110. That law became a part of the contract and the bondholders are entitled to *its* benefits. On May 26, 1943 the state by a legal enactment and in recognition of the moral obligation on the part of the *City of Reading* to pay for the

improvements of one of its boulevards decreed that the obligation to pay the bondholders who had advanced the money for this improvement rested alone upon the City of Reading. As Chief Judge CARDOZO declared in *Mac-Pherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050, any obligation may find "its source in the law". This law of May 26, 1943, became a part of the bondholders contract and since it did not give him even one additional dollar for the dollars that he advanced for the payment of a public improvement which benefited the City of Reading *it is valid* since not one line or word in the State Constitution forbade the State Legislature passing such a law as the Act of May 26, 1943.

The unanimity with which the courts of this country have upheld the constitutionality of statutes imposing upon municipalities benefited the obligation to pay for public improvements even though in the first instance the obligation had been imposed upon abutting property owners or had been voluntarily assumed by individuals, is disclosed by a consideration of the following cases. In every instance the constitutionality of the statute was upheld because of the moral obligation.[5] of the municipality to assume the burden of paying for the improvement and this moral obligation *arose solely from the fact that the improvement was for the public benefit.*

The sound reasoning behind these numerous cases was set forth in the case of *Thomas v. Leland*, 24 Wendell's (N. Y.) 65. In that case "several individuals, . . .

---

[5] A "moral obligation means that some direct benefit has been received by the state . . . where in fairness the state may be asked to respond, . . ." *People v. Westchester Co. Nat'l. Bank*, 231 N.Y. 465, 132 N.E. 241. "Moral obligation is an obligation which could not be enforced at law but which is recognized in fair dealing and ordinary business honor": *Jones v. Loungman*, 288 N.Y.S. 44. "Moral obligation in law is one that cannot be enforced by action, but which is binding on the parties who incur it in conscience and according to natural justice": *Rathon v. Locker*, 215 Pa. 571, 64 A. 790.

joined in a bond . . ., conditioned to pay into the treasury, . . . $38,615, . . ." the cost of terminating a canal at Utica instead of at Whitesborough. Afterwards "the legislature deeming the debt thus contracted by individuals, unreasonably partial and onerous, passed the statute now in question, the object of which was to levy the tax on the owners of real estate in the city of Utica". New York's highest court sustained the constitutionality of the act of the legislature which relieved the individuals of the burden they had assumed and placed it on the municipality benefited by the extension of the canal.[6]

The Supreme Court of New Jersey in *O'Neill v. Mayor of Hoboken*, 72 N.J.L. 67, 60 A. 50, decided that the legislature had the power to make the municipality benefited pay for a public improvement (a drainage canal), even though originally it was provided that the improvement should be paid for by "Improvement Certificates" to be liquidated by the payments of assessments. The Act passed declared that "the outstanding debts incurred therefor in the form of improvement certificates shall be a lawful indebtedness of the municipality concerned." The Supreme Court of New Jersey said: "That the drainage of these extensive swamps within the city of Hoboken would be conducive to the health and comfort of the community throughout the city, and hence was a matter of local interest and benefit which the legislature might have committed to and made chargeable upon the municipality, is not, and, I think, cannot be questioned. 10 Am. & Eng. Enc. Law, 220." It also said: "When, under a contract for compensation entered into with some public agency, a private party has rendered service or expended money in an enterprise which is beneficial to a particular municipality, and for which

---

[6] This New York case was referred to approvingly by Justice STRONG. speaking for this court, in *Schenley v. Com.*, 12 Casey 29, and by Justice READ in *City of Philadelphia v. Field, et al.*, 58 Pa. 320.

the legislature might in the first instance have made that municipality chargeable, it is competent for the legislature to discharge the original agency and fix the obligation to pay the compensation on the municipality itself."

The unanimous opinion of this court in *Sambor v. Hadley, Controller*, 291 Pa. 395, 140 A. 347, in its basic reasoning is a complete answer to the position taken by the majority opinion in the instant case. The facts were that the Sesqui-Centennial Exhibition Association, a private corporation, chartered on May 9, 1921, undertook to hold a Sesqui-Centennial Exhibition in Philadelphia in 1927 and on and before June 28, 1926, Philadelphia appropriated $4,000,000 to aid this Exhibition, which proved to be a financial failure. The city on December 17, 1926, assumed the payment of debts amounting to $5,000,000 "to enumerated persons, firms and corporations", which debts were incurred in connection with the Sesqui-Centennial. Municipal bonds were sold to the public in order to raise this money.

On March 2, 1927 (P. L. 7) an Act was passed by the Pennsylvania Legislature "validating all bonds issued by any city of the first class for any public exposition celebrating the sesquicentennial anniversary". This Act was passed after the debt of $5,000,000 had been incurred, resulting in payments totalling that sum to certain individuals and corporations who had furnished services and material to the Sesqui-Centennial amounting to $5,000,000. The taxpayers filed a bill against the City of Philadelphia and its fiscal officers attempting to restrain the payment of these bonds. They claimed that to use public money to pay these bonds violated the following provisions of the Constitution: Article 9, Section 7, Article 3, Sections 7 and 20, and Article 15, Section 2. They contended (as the majority contend in the instant case) that "A moral obligation arises only out of an actual debt which has become uncollectible because of some defect in the law under the authority of which

it was originally contracted." This court overruled this contention and held that the bonds constituted a "moral obligation" of the City of Philadelphia. The Supreme Court cited with approval this statement by the court below: "That the 150th anniversary of the signing of the Declaration of Independence was a suitable occasion for the holding of a celebration of a public character, is a matter beyond question . . . There can be no doubt that, under the cases hereinbefore considered, the celebration of the sesquicentennial fell within the scope of a public purpose for which the municipality could make proper appropriations, . . . The objection by appellant that the debts authorized by the ordinance of December 17, 1926, were not actual debts of the city but were those of the Sesqui-Centennial Exhibition Association, is answered by the curative Act of April 6, 1927, supra, authorizing cities of the first class to pay for 'work previously done, material previously furnished, or services previously rendered' in connection with the sesquecentennial celebration 'up to . . . $5,000,000,' . . . This act shows that the legislature itself (Kennedy v. Meyer, 259 Pa. 306, 317) recognized debts of the character of those now before us as moral obligations of the city (Bailey v. Phila., 167 Pa. 569, 573), . . ."

Though the curative Act of March 2, 1927, P. L. 7, *passed after the debts of $5,000,000 had been incurred resulted* in a "windfall" of $5,000,000 to certain individuals, partnerships and corporations who or which had furnished labor and materials to the exhibition, this court held that since the money was spent for a *public purpose* the city was under a "moral obligation" to pay the debts incurred.

It is true that on February 1, 1922, a resolution was passed by the City Council "pledging the municipal honor, faith and credit to carry on in every possible way the work of the exhibition", but *no such resolution* could have made the $5,000,000 appropriated five years later to pay for work and materials furnished the ex-

position a valid appropriation.[7] The fact that made the appropriation *not* contrary to the Constitution was the fact that the Court held the Sesqui-Centennial Exhibition to be a *public undertaking,* and the money spent for this exhibition was therefore spent for a *public purpose.* When the validating Act of 1927 was passed and the Exhibition was *over* and whatever public purpose it had served had been *accomplished, nevertheless,* this Court declared that since the money was spent for a public purpose the City of Philadelphia was under a *"moral obligation"* to make good this expenditure to those who had made it. *The test on which the decision turned was whether or not the money was spent for a public purpose.* That is exactly the test to be applied to the case now before the Court. Since the improvement of Kenhorst Boulevard was for a public purpose the legislature was acting within the ambit of its constitutional authority when by the Act of May 26, 1943 it ordered its creature, the City of Reading, which got the benefit of the improvement to reimburse those bondholders who had advanced the money to pay for the improvement.

In *Bessemer Inv. Co. v. City of Chester,* 113 F.(2d) 571, 22 F. Supp. 311 (1938), the Federal District Court considered the same type of act in the present case as passed by the Pennsylvania Legislature in 1929, 1931, and 1933 and upheld their constitutionality against the contention of the City of Chester. Judge MARIS in his opinion quoting from *American Company v. City of Lakeport,* 220 Cal. 548, 556; 32 P. 2d 622, 623, said:

---

[7] If the city council of Philadelphia had passed a resolution inviting some popular man to take up his residence in Philadelphia and had pledged "the municipal honor, faith and credit" to provide him with a suitable home "free of charge" that resolution *would not* have made valid an ordinance later passed to appropriate money to pay for the home so pledged and promised for the obvious reason that supplying homes to popular individuals at public expense is *not serving a public purpose.*

". . . it is argued that if the city is compelled to pay the delinquent assessments, it will thereby make a gift of public funds to private bondholders. This precise question was considered by us in Stege v. City of Richmond, 194 Cal. 305, at page 318, 228 p. 461, and it was there said: 'The argument assumes that in the improvement of the streets the work is a private matter. On the contrary, such work is for a public purpose. The city might have expended its general funds for the purpose.' It is well settled that funds directed toward a public purpose are not within the constitutional prohibition merely because of *incidental benefits to individuals.* Veterans' Welfare Board v. Jordan, 189 Cal. 124, 208 Pac. 284, 22 A.L.R. 1515." (Italics supplied) "The situation is similar to that which arises when an act is passed validating a municipal bond issue which is invalid by reason of defects in the procedure by which it was authorized. Such acts, although authorizing payment to bondholders who had no valid claim against the municipality, have been upheld in Pennsylvania. Swartz v. Carlisle Borough, 237 Pa. 473, 85 A. 847, Ann. Cas. 1914B, 458; Palmer's Appeal, 307 Pa. 426, 161 A. 543. So also have acts been upheld which authorize municipalities to pay claims for work done without previous authority of law, often called moral claims. Kennedy v. Meyer, 259 Pa. 306, 103 A. 44."

A careful analysis of the California case of *American Co. v. City of Lakeport, supra,* (cited by Judge MARIS) reveals that its entire rationale is opposed to the position taken by the majority in the instant case. In the California case the city's "resolution of intention declared that the work" on certain streets would be "paid for by special assessments levied upon an improvement district described therein". The contractors performed the required work, but the property owners "failed to pay the assessments". The law of California gave the city the right to purchase land "at any delinquent sale" of land

for nonpayment of taxes or of assessments made to pay for public improvement bonds and provided that if the city purchased such lands it shall pay into the redemption fund the amount of the delinquent assessments and delinquent interest upon which the sale was made, and that if there were no available funds in the treasury with which to make such payment the City Council could include in the next tax levy a suitable amount for the purpose of providing funds with which to make such payment. The constitutionality of the Act which contained these provisions was challenged, and as the Supreme Court of California pointed out, a rehearing was granted "in order to give fuller consideration to the difficult questions of constitutionality and statutory construction involved". Apparently about fifty lawyers were represented in the argument, most of them being city attorneys who appeared as amici curiæ.

The Supreme Court of California in deciding the same question as is now before this court, said:

"It is the position of the appellants that the ordinance adopted by the city requiring the city to purchase the property at the sale is imposing a burden upon all of its taxpayers for the benefit of the bondholder who holds the same in private ownership, thus constituting a gift to the bondholder in contravention of section 31 of Article 4 of the Constitution. 'The argument assumes that in the improvement of streets the work is a private matter. On the contrary, such work is for a public purpose. The city might have expended its general funds for that purpose.' It is well settled that funds directed toward a public purpose are not within the constitutional prohibition merely because of incidental benefits to individuals. Veterans' Welfare Board v. Jordan, 189 Cal. 124, 208 P. 284, 22 A.L.R. 1515."

In *Imboden v. City of Bristol (Tenn.)* 179 S.W. 147, a similar question was decided. The Supreme Court of Tennessee said:

"The improvement of a city's streets is an improvement of a public nature, an improvement of the city's

own property, the enjoyment of which is not confined to adjacent property owners. That adjacent owners derive special advantage therefrom sufficient to justify the levy of a special assessment upon them does not alter the case. The work is still of a public character, and expenditures for the same are expenditures for a corporation purpose."

The majority opinion says: "The decisions in other jurisdictions are in accord with the views thus expressed by our own courts." My answer to that statement is that the decisions in all other jurisdictions, with the *exception* of Illinois, are *diametrically opposed* to the position taken by the majority opinion. The decisions of the highest courts of at least fourteen jurisdictions hold in cases involving the same basic question involved in the instant case that a state legislature *can* authorize and direct a municipality to pay for public improvements out of public funds even though the original plan was to make the abutting property owners pay for the improvement. The highest courts of thirteen states and one territory have handed down opinions which are completely opposed to the majority opinion in the instant case. These jurisdictions are as follows: New York, New Jersey, Connecticut, Ohio, Michigan, Texas, Florida, California, North Dakota, Montana, Colorado, Washington, Utah, and the Territory of Hawaii. The views of the highest courts in these jurisdictions are well expressed in the decision of the Supreme Court of North Dakota in *Marks v. Mandan* (1941) 70 N.D. 474, 296 N.W. 39, as follows:

"The various arguments advanced as to the unconstitutionality of a statute requiring the levy of a general tax to meet deficiencies resulting from the failure of special assessment collections lose their virility when we consider that we are dealing with the question of legislative power under the Constitution, in light of the unquestioned fact that the legislature might have provided for the payment of the type of improvement in-

volved in this case by general taxation without notice or hearing as to individual benefits resulting from the improvement. The legislature might have authorized municipalities to incur a general primary indebtedness for the purpose of creating such an improvement. It therefore follows that the legislature may provide for these local improvements to be paid for, in whole or in part, by general taxes; or to be paid primarily by special assessments, with a provision to care for deficiencies by general taxation." And further on in the opinion the court stated: "The question of the extent to which the city may go in bearing the expense of such a system through general taxation lies within the field of legislative discretion; and its reasonable exercise, even to the extent of permitting or requiring the city to assume certain deficiencies that may arise in the collection of assessments levied against private property, does not invade constitutional rights of general taxpayers of the city."

The following opinions from the highest courts in other jurisdictions are in accord with the views expressed in the North Dakota case: *Whitman v. Royal Oak Twp.* (1934) 269 Mich. 146, 256 N.W. 835; *Highland Park v. Dearborn Twp.* (1938) 285 Mich. 440, 280 N. W. 820. (This latter case held that the holders of special improvement bonds were entitled to a decree directing the levy of a general tax by the township sufficient to enable the township to pay the bonds in suit.) *English v. Smith* (1938) 123 Conn. 572, 196 A. 781; *Hansen v. Havre* (Mont.) 114 Pac. (2d) 1053; *Dunsmuir v. Porter* (1936) 7 Cal. (2d) 269, 60 P. (2d) 836; *Bowman v. Allen County* (1931) 124 Ohio St. 174, 177 N.E. 271; *Montgomery v. Denver* (1938) 102 Colo. 427, 80 P. (2d) 434; *State ex rel. Bigham v. Powers* (1911) 124 Tenn. 553, 137 S.W. 1110; *Deseret Sav. Bank v. Francis* (1923) 62 Utah 85, 217 P. 1114; *Comfort v. Tacoma* (1927) 142 Wash. 249, 252 P. 929; *Dos Anigos, Inc., v. Lehman* (1930) 100 Fla. 1313, 131 So. 533; and *E. E. Black, Ltd. v. Conkling* (1936) 33 Hawaii 731.

As against this array of cases the majority opinion cites the case of *Hoagland v. Sacramento*, 52 Cal. 142, 150. *This case has no bearing whatever on the question now before us.* In that case it was decided that "If the Levee Commissioners of a city, by virtue of authority vested in them by an act of the Legislature, and independent of the city authorities, excavate a canal in the vicinity of the city, to turn the water flowing in a river, and prevent it from overflowing the city, one injured by the water flowing in the canal has no claim, equitable or legal, against the city for his damages".

The case quoted at length in footnote 2 of the majority opinion is *Berman v. Board of Education of City of Chicago*, 360 Ill. 535, 196 N.E. 464. That case held that the Legislature could not authorize a school district to issue bonds to pay the amount due under anticipation warrants against the taxes for educational purposes. The Illinois court took the position that a school district cannot "issue bonds and assume a legal liability for the payment of what it characterizes as 'a moral, equitable and honorable obligation.' " Thus the Illinois court holds that the state cannot authorize the expenditure of public moneys in payment of moral and equitable obligations. The majority opinion takes the view that a state *can* authorize the expenditure of public moneys for such obligation, but it denies that there is any moral or equitable obligation on the part of the City of Reading to pay the bonds in suit. Judge COOLEY and other eminent authorities hold that a state can authorize the expenditure of public moneys for the payment of a moral or equitable obligation. The Illinois court held that the money appropriated in this case was not for a public purpose. This is manifestly erroneous and is contrary to the decisions in all the many other states herein named. In the Illinois case there was a strong dissenting opinion by Justice SHAW, in which he cites the case of *Chicago, Danville & Vincennes Railroad Co. v. Smith*, 62 Ill. 268, 14 A.M. Rep. 99, where the court held that "a township

donation to a railroad, made under legislative authority and under sanction of a majority vote of the people, was a corporate purpose for which the township authorities could assess a tax". He added: "In that opinion we said: 'It is contended that the appropriation was not for a "corporate purpose". If it was for a public purpose —for the benefit of the inhabitants of the municipality— then it would be for a corporate purpose. The latter cannot be distinguished from the former; and all that we have said in relation to the public purpose of the tax, will apply with equal force to a corporate purpose.' " Justice SHAW then says:

"In his work on Constitutional Limitations Cooley states (sec. 129) that taxes should be levied only for those purposes which properly constitute a public burden, but that what is for the public good and what are public purposes, and what does properly constitute a public burden, are questions which the legislature must decide upon its own judgment and in respect to which it is vested with a large discretion, which cannot be controlled by the courts, except, perhaps, where its action is clearly evasive, and where, under pretense of a lawful authority, it has assumed to exercise one that is unlawful."

In the Idaho case cited in footnote 2 of the majority opinion: *Oregon Short Line R. Co. v. Berg et al.,* 116 P.(2d) 373, there was also a dissenting opinion by two judges. It was a 3 to 2 decision. The majority held that to "increase the liability upon these bonds to the extent of the special additional tax on internal taxpayers would, to that extent, impair the obligation of their contract by increasing their liability". This proposition, of course, is absurd [8] and no other court in the country ever took such a position. It also held that the "Statute authorizing municipality to create bond guaranty fund

---

[8] See 43 Corpus Juris, section 291, at p. 274, and *Williams v. Baltimore,* 289 U.S. 36, 53, and *Trenton v. New Jersey,* 262 U.S. 182.

from general taxes to pay deficiencies in local improvement district assessments, without providing for notice to taxpayers, held void as not affording them due process". That reasoning, of course, is not applicable to the case at bar.

I will now review the Pennsylvania cases which the majority opinion cites in support of the position that opinion takes. None of them give any support to the majority opinion.

First, *Tyson et al. v. The School Directors of Halifax Township,* 51 Pa. 9. That case simply held that the Act of August 25, 1864, P. L. 1026 "did not cover mere voluntary payment of moneys contributed as a mutual fund to save contributors from the draft". As this court expressed it: "Were the moneys paid out by the association, advancements in aid of the township within the meaning of the Act, or only an appropriation by it of the voluntary contributions of its members to relieve themselves?" The court held that since it was the latter the "contribution" was not within the terms of the Act. This case obviously has no applicability to our case.

Second, *Faas v. Warner,* 96 Pa. 215. This case has not the slightest bearing on the instant case. Justice GREEN points out in his opinion that "the entire contract price was paid Sheriff Woods" and that out of this price he was obligated to pay for the food for prisoners and that therefore his personal debt for food he bought for prisoners was no obligation of the county. The county had paid him in full under its contract with him.

Third, *Supervisors of Sadsbury Township v. Dennis, et al.,* 96 Pa. 400. This case relates solely to bounties in the Civil War. In submitting the case to the jury the trial judge said:

" 'Did these plaintiffs in obedience to the Act of Assembly of 1864, officially provide for the procuration of bounties to be paid to volunteers? How much have they received? How much have they become indebted for? How much have they paid out? If they have paid

out more than they received from the township by public taxation, they are entitled to recover in this suit.'"

We said:

"We see no error in this nor in the other comments of the court upon the questions at issue or the testimony relating to them. The jury have found by their verdict that the plaintiffs did pay out for the township a greater amount than they received, and that finding is conclusive."

That case really supports the position I take in this opinion. It held that individuals could be reimbursed out of the public treasury for money they expended *for a public purpose.*

The case of *Strock v. Cumberland County,* 176 Pa. 59, 34 A. 352, (cited in the majority opinion) is inapplicable. That case held that when a sheriff entered upon the duties of his office and "the compensation for boarding prisoners was fixed by law" and that "during the whole of this time until the 27th of December, 1894, no change had been made in the amount of compensation allowed for the boarding of vagrants. . . To that compensation, and no more, was the plaintiff entitled . . . It has never been decided that an increased compensation could be given for services rendered". In the instant case there is no question of increased compensation for services rendered. The question is: Does the legislature have the power to make the City of Reading pay for a public improvement out of the public treasury?

*O'Rourke v. Philadelphia,* 211, Pa. 79, 60 A. 499, (cited in the majority opinion) has no bearing on the instant case. That case simply held that a contractor after having done the work mentioned in his contract and receiving the price therein stipulated cannot maintain a suit against the city for the work included in the contract and not mentioned in the specifications. *Cunningham v. Dunlap,* 242 Pa. 341, 89 A. 129, simply holds that for what is done under a contract with the city the contractor can receive from the municipal treasury only

what the contract stipulates is to be paid to him, and councils cannot give him more. *Longstreth v. City of Philadelphia,* 245 Pa. 233, 91 A. 667, held, in the language of this court, that 'appellants' decedent, who had a contract with the City of Philadelphia in connection with the construction of a sewer, had been fully paid for all the work called for by his contract, and that, as he had done nothing additional, there was no moral obligation resting upon the city to pay him more." *Edwards v. McLean,* 23 Pa. Superior Ct. 43, holds that after public officers have rendered their services they cannot be given extra compensation for such services. All these cases obviously do not have any bearing whatsoever on the question before us in the Reading case.

In footnote 2 the majority opinion cites *City of Chicago v. Brede,* 218 Ill. 528, 75 N.E. 1044. A statute of Illinois provides that cities and villages can make local improvements and pay for them by special assessments *or* pay for them by general taxation *as the city may by ordinance* prescribe. (Italics supplied) An ordinance prescribed payment by special assessment. The court held that the city having formally decided to pay for the improvement by special assessment could not pay for it out of a general fund raised by taxation. In other words, there was no formal action by the city or state authorizing the payment out of the city's general fund. *Midland Lumber Co. v. Dallas City,* 276 Ill. 172, 114 N.E. 580, is in its facts practically identical with the preceding case.

*Stemler v. Mayor of New York,* 179 N.Y. 473, 482, 72 N.E. 581, 584, is also cited in footnote 2 of the majority opinion. In that case a man exercised *de facto* the duties of justice of the district court, claiming to have been duly elected. He was paid a salary. The man who was found to be the de jure officer later sued for his salary. It was held that he could not recover it. The court of appeals said:

"As the city had the right and it was its duty to pay the salary to McGuire during his actual incumbency, and, having paid it, it cannot be required to pay it again to the plaintiffs. The remedy of a person wrongfully deprived of an office is to recover his damages for the wrong against the usurper."

*Bush v. Board of Supervisors,* 159 N.Y. 212, 53 N.E. 1121, is also cited in footnote 2 of the majority opinion. During the Civil War the Federal government drafted recruits, but permitted them to pay in lieu of service a specified sum of money. Certain citizens of Orange County, New York, availed themselves of the privilege of avoiding service by payment of this money. In 1892 the State of New York passed a law empowering county supervisors to raise funds by taxation and repay the money so expended by draftees. The Court of Appeals of New York held that this was unconstitutional since the money that the individuals paid out was spent merely to "save their own skins". The Court of Appeals said:

"Those who actually served under the conscription only discharged their obligations to the general government. Those who commuted simply paid so much money in order to be relieved from the obligation to render military service. In either case the individual did nothing more than to discharge his obligations to the government as a citizen, and hence he had no claim against the locality to reimburse him for what he was obliged to do."

The Kansas case of *Craft v. Lofinck,* 8 Pac. 359, cited in footnote 2 of the majority opinion reflects the position I take in the instant case. In that case the Supreme Court of Kansas recognized the fact that a public improvement such as a bridge gives rise to such a "moral obligation" on the part of the community benefited by it that it is lawful to make that community pay for it out of public funds, but that the people of Township No. 1, who do *not need* a bridge in Township No. 2, are under *no moral obligation* to help pay for that bridge

and that therefore an Act of the Legislature so far as it tends to make them [i.e. the people of Township No. 1] liable is unconstitutional and void.

The Louisiana case of *Forman v. Sewerage and Water Board of New Orleans*, 66 So. 351, does *not* support the majority opinion. This case holds (quoting from the first syllabus) :

"The Legislature may compel a municipal corporation to pay a debt which is equitable in character, though not binding in law, but it has no power to compel such a corporation to pay a claim with respect to which it is under no obligation, moral or equitable; and the less so where the issue of obligation vel non has been finally decided between the parties, by a court of last resort . . ."

In *Kennedy v. Meyer*, 259 Pa. 306, 103 A. 44, (cited in footnote 1 of the majority opinion), this court interpreted Article 3, Section eleven, of the Constitution. We held that the provision was not applicable when "No extra compensation is given to anyone by the terms of the Act" challenged and that the claim made in that case was "not within the mischief against which the above provision is a protection". We upheld the Act of 1917, which provided for the payment to the contractor for work done on a public improvement under an unconstitutional act. Justice MOSCHZISKER said, "the Act of 1917 does not treat the obligations with which it deals as 'gratuities' but 'moral obligations that have ceased to be legal ones' ". The obligations *were* "moral obligations" because the work done was for the public benefit. The "moral obligation" in such cases does not arise from "some technical difficulty in the legislation which authorized it". It arises from the fact that *by the work done a benefit was conferred upon the public.* This was made clear by Justice FIELD in *New Orleans v. Clark*, 95 U.S. 644, where he, speaking for the United States Supreme Court (p. 653) said : "It is certain that illegally issued bonds should be paid by the city *because they*

*were issued for work done in its interest of a nature
which the city required for the convenience of its citizens*
and which its charter authorized. It was, therefore, competent for the legislature to interfere and impose the
payment of the claim upon the city." Justice FIELD
adds: "The power of the legislature to require the payment of a claim *for which an equivalent has been received,* and from the payment of which the city can
only escape on technical grounds, would seem to be
clear." (Italics supplied)

In *Read v. Plattsmouth,* 107 U.S. 568, the United
States Supreme Court upheld the constitutionality of
an act of the Nebraska legislature legalizing certain
invalid bonds issued for the building of a public school.
The court said: "The statute in question does not impose
upon the city of Plattsmouth, by an arbitrary act, a
burden without consent and consideration." The court
pointed out that since the city had secured a public
school house the city was under "an obligation to restore the value thus received" and that "this obligation
was capable of judicial enforcement". Here the enforceable obligation arose out of the *benefit conferred on the
public.* That is precisely the situation in the case now
before us.

Supposing, for example, that the 160 mile Pennsylvania Turnpike had been built at the cost of abutting
property owners (assuming the abutting property to be
valuable enough to support such a burden), and suppose that the legislature should, after the Turnpike was
built and used, decide that it was a great public benefit
both in peace and in war and that, therefore, the state
should relieve the abutting property owners of the cost
of building the Turnpike, and the legislature should
then by an appropriate act of legislation provide for
the payment of the improvement bonds out of the public
treasury. Is there anything in the state constitution
which would prevent the state from doing this? *There
is no such provision.*

As Justice STRONG said in *Schenley v. Commonwealth,* 36 Pa. 29, "it has repeatedly been ruled, in this and other states, that the legislature may impose upon a local district a tax to pay the expense of a public improvement already made. Such laws interfere' with no contract, and divest no vested rights."

The majority would argue (in the supposed Turnpike case) that the act of the legislature in relieving the abutting property owners of the cost of the Turnpike, placing that cost on the state, would be unconstitutional because (quoting the language of the majority opinion) "No. consideration or benefit of any kind was received by the city [State] in return for the liability imposed upon it, nor was any public purpose thereby subserved." Such a "reason" would be contrary to the facts because the Turnpike does benefit the state exactly as the improvement of Kenhorst Boulevard benefited the City of Reading.

Cooley's Constitutional Limitations, 8th-edition, Vol. I, at page 485, says: "The legislature is not confined in its appropriation of the public moneys, or of the sums to be raised by taxation in favor of individuals, to cases in which a legal demand exists against the State. It can thus recognize claims founded in equity and justice in the largest sense of these terms." Cooley cites *Weister v. Hade,* 52 Pa. 474, in which this court held: A township being unable to procure volunteers under the Bounty Law of 1864 for $300, the citizens voluntarily advanced money to pay bounties beyond that amount, with the understanding that it was to be repaid when a law was passed authorizing taxation to repay them. In sustaining the law as constitutional Justice AGNEW held that the loans contemplated were not loans in a legal sense, they had reference only to claims upon the conscience and moral sense of the community relieved thereby. Justice AGNEW said:

"These authorities [Marshall, Gibson, Black] abundantly prove the large grant of power to the legislature;

the unlimited extent of the taxing power; the undoubted right to apply it to all objects promotive of the general good in any degree, though remote and indirect . . . The moral obligation resting on a community to refund money expended for a public good, is not less obvious than that of an individual, constituting a good consideration in law to support his promise to repay . . . If there be the least possibility that making the gift will be promotive in any degree of the public welfare, it becomes a question of policy, and not of natural justice; and the determination of the legislature is conclusive."

In *Mercer v. Watson,* 1 Watts 330, at 357, Chief Justice GIBSON said: "in matters of civil jurisprudence, statutes simply retrospective have not been disregarded by the courts, but for disobedience of some plain, palpable and positive mandate". See also what Justice SERGEANT said in *Hepburn v. Curtis,* 7 Watts 300 at p. 301, about the power of the legislature to give by "retrospective law" a remedy, provided the act "does not violate the constitutional prohibitions".

It is significant that on the only occasions the precise question now before us has been before any court in Pennsylvania, the constitutionality of such acts as that of May 26, 1943, has been upheld.[9] Federal Judge MARIS'

---

[9] The Act of April 11, 1929, P. L. 509, was an Act to validate, as debts of the municipality, bonds and obligations issued by municipal corporations for the payment of the cost of a public improvement which were to rest alone for their security and payment upon assessments for benefits. There were similar Acts passed on June 23, 1931, P. L. 929, and on June 3, 1933, P. L. 1466. The constitutionality of these Acts was upheld in *Vansciver v. Sharon Hill Borough,* 33 D. & C. 383; in *In Re Indebtedness of City of Easton,** 25 Northampton 347; and in *Palmer v. City of Erie,* 20 Erie County Law Journal 400. In the Northampton County case Judge STEWART said:

* "Municipalities, however, are the creatures and agents of the Legislature in the performance of governmental duties and it has been held, therefore, that their contracts are subject to the control of the Legislature. The Legislature can impose additional burdens and can take away contractual rights of its municipalities . . . In support of the above statement of law we

decision in *Bessemer Inv. Co. v. City of Chester,* supra, has already been referred to.

The reasons why a due regard for the constitution and for established legal principles requires the affirmation of the judgment of the court below may be summed up as follows:

1. "It is one of the inherent and implied powers of the city to pave, grade, sewer and otherwise improve its streets, and to pay therefor: . . . There is nothing whatever in this latter Act [the Act of 1891] from which it can be inferred that the method provided therein for assessing the cost of these improvements was intended to limit the power of councils to pay for the improvements in that way alone [i.e., by assessments upon abutting properties]. The power therein given is additional to the power to do this work at the expense of the city." *Com. v. George,* 148 Pa. 463, 467, 24 A. 59.

2. The City of Reading could in the first instance have assumed the obligation of paying out of the public treasury the cost of paving Kenhorst Boulevard. That is conceded.

3. The City of Reading is the creature and agent of the state and the state has at all times the power, acting through the legislature, to compel the City of Reading

quote the following from 12 Corpus Juris [page 1003, section 623] : — 'Municipal corporations, such as counties, cities, and towns, being mere creatures and agents of the state, stand in their governmental or public character in no contract relations with the state, and so are not within the provision that renders laws impairing the obligation of contracts unconstitutional; but at the pleasure of the state their contracts may be amended, changed, or revoked, subject only to the restraints of special constitutional provisions.' " The quotation from 12 Corpus Juris continues as follows: "So, in general, the imposition by the state of added burdens on them as governmental agents of the state for the public benefit is valid, provided that property owned by such corporations is secured for the use of those having an interest in it. . . . Powers of a public nature granted may be recalled, modified . . . one exercise of such legislative power not precluding another."

to pay for the construction and improvement of its public streets.[10]

4. The Commonwealth of Pennsylvania did not lose its power to make the City of Reading pay for the improvement of Kenhorst Boulevard by reason of the fact that the City Council of Reading had decided that the abutting property owners should pay for it. *No act of the City of Reading can take away any power of the state legislature.*

5. A law compelling a local district to pay the expense of public improvements "already made . . . interferes with no contract and divests no vested rights", as Justice STRONG said, speaking for the Supreme Court in *Schenley v. Commonwealth,* 12 Casey 29. (Quoted by Justice AGNEW in *Weister v. Hade,* supra)

6. No court has power to *write into a constitution* prohibitions on the authority of the legislature. Courts can only apply constitutional prohibitions which *plainly exist.* In our state constitution there can be found no provision prohibiting the state legislature saying, as it did say in the Act of May 26, 1943, to the City of Reading (and to all other municipalities to which the Act applied) : "Despite the fact that your Council decided to saddle the burden of paying for this public improvement upon the abutting property owners, we order you to assume this burden yourself because in fairness and according to natural justice you should assume it since it is *you* and *not the abutting property owners* who is chiefly benefited by it."

Due respect for the constitutional authority of the legislature of this Commonwealth requires an affirmation of the judgment of the court below. That judgment should be affirmed both because it is right and because it is in accord with every decision of practically every court in the United States which has passed on the same, or on a substantially similar, question.

---

[10] See *Philadelphia v. Field, et al.,* 58 Pa. 320, and *Philadelphia v. Fox,* 64 Pa. 169, 180.